[No. B066347. Second Dist., Div. One. June 30, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL KENNETH ANDERSEN, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication through the end of part II of the Discussion.

COUNSEL

Gail Harper, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack Assistant Attorney General, John R. Gorey and Mary Sanchez, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

## SPENCER, P. J.—

### INTRODUCTION

Defendant Michael Kenneth Andersen appeals from a judgment of conviction entered after a jury trial. The jury found him guilty of four counts of gross vehicular manslaughter (Pen. Code, § 191.5, subd. (a)) and one count of causing injury while driving under the influence of alcohol or drugs (Veh. Code, § 23153, subd. (a)). The jury also found true the allegation that defendant caused injury to five named individuals (*id.*, § 23182). Defendant's motion for a new trial was denied, after which he was sentenced to state prison for the term prescribed by law.

### STATEMENT OF FACTS

Some time after 10 p.m. on September 9, 1990, Cecilia Sanchez (Sanchez) was driving her pickup truck home to San Ysidro after a family gathering in El Monte. Riding with Sanchez in the cab of the truck were her sister, Sofia, Sanchez's son, Isaac, and her nephew, Juan Castaneda. Riding in the back of

the pickup truck were four more of Sanchez's children, Christina, Ernestina, Adriana and Ernesto Jr., as well as Sanchez's sisters, Angelica and Irma Flores, and Sanchez's nieces, Vanessa Figueroa, Jessica Carrillo and Monica and Sandra Flores. After Sanchez entered the 605 Freeway, Isaac told her he had to go to the bathroom. He was quite insistent and, after Sanchez entered Interstate 5, began to cry.

Sanchez pulled over to the paved right shoulder of the freeway, which can be used as a traffic lane from 3 to 7 p.m., to allow Isaac to relieve himself. There is a gravel shoulder beyond the paved shoulder/conditional use lane, but there is a significant slope to it. When Sanchez pulled over, she did not see any vehicles or headlights behind her truck. The taillights and license plate light of the pickup truck were illuminated. After Isaac relieved himself, he had trouble with the buttons of his trousers. Sanchez leaned over to the passenger door and told him to hurry. As she looked up, she saw headlights in the rear view mirror and realized an approaching vehicle was going to hit the truck.

The impact of the collision propelled the truck down the gravel slope toward some trees. Once the truck stopped moving, Sanchez got out. She saw her truck had been struck by another pickup truck. Everyone who had been riding in the bed of Sanchez's truck was on the ground. Two of Sanchez's children, Ernestina and Ernesto Jr., were lying on the freeway, as were Angelica Flores and Vanessa Figueroa. Sanchez's other children, Christina and Adriana, and her nieces, Jessica Carrillo and Monica and Sandra Flores, were lying on the side of the road. Irma Flores was lying among some trees. Isaac began screaming when he saw the children lying on the freeway were not getting up. Defendant was standing by the freeway lanes. When Sanchez asked him what had happened, he said, "I'm sorry."

Steven Hall (Hall), a driver for Ralph's Grocery Company, was driving a large tractor-trailer south on Interstate 5 at approximately 10:45 p.m. that night, traveling in the right-most or number three lane, when he saw headlights approaching in his right-hand sideview mirror. A vehicle was traveling on the right shoulder/conditional use lane, apparently intending to pass Hall; this was unusual. Hall checked his left-hand sideview mirror and saw there was no traffic next to or near his truck in the number one and number two lanes. At this point, the vehicle traveling in the conditional use lane passed Hall's truck at a speed of 55 or more miles per hour. Within seconds, Hall saw sparks flying across the freeway and realized there had been a collision. He had to swerve to avoid hitting three children lying partly on the shoulder and partly in the number three lane.

Hall stopped, made an emergency call, then walked back to a chaotic scene. A woman was screaming in Spanish and many children were screaming and crying. Defendant had a gash in his forehead; while he said he was

all right, he was incoherent and Hall surmised he was in shock. Defendant said, "Oh, my God. What happened." Hall smelled the odor of alcohol on defendant's breath.

California Highway Patrol Officer Laura Ann Ales arrived shortly after the ambulances. She found defendant at the back of one of the ambulances; he had obvious cuts and abrasions to the forehead. Officer Ales asked what had happened. Defendant told her he was traveling southbound on Interstate 5 in the number three lane when he came upon the Ralph's truck. As the truck slowed, defendant moved onto the shoulder/conditional use lane to pass it; he was traveling 60 to 65 miles per hour. Defendant said he was coming from his home in Whittier and intended to take the next exit at Pioneer Boulevard to deliver an air compressor in Norwalk. After defendant passed the Ralph's truck, he saw a vehicle ahead of him. He tried to but could not avoid the accident. Defendant acknowledged that he had entered the conditional use lane when he was not authorized to do so.

During this conversation, Officer Ales had detected the odor of alcohol. She noted that defendant's eyes were bloodshot, and asked him if he had been drinking. He stated he had two beers within the hour preceding the collision, but had not drunk anything since then. He stated he had not taken any drugs or medication. Because of defendant's head injury, Officer Ales did not attempt to have him perform the usual field sobriety tests. Instead, she had him perform the less reliable finger-count test. He did so properly. A preliminary alcohol screening device showed a positive result for alcohol.

The skid marks left by defendant's truck formed an arc from the shoulder/conditional use lane into the number three lane, then back into the conditional use lane. The skid marks were not consistent with hard braking.

It was a violation of law to drive on the shoulder of the freeway as defendant was doing. Driving on the shoulder at a speed of 55 miles or more, attempting to pass a large tractor-trailer at night, constituted an unsafe maneuver. The portion of Interstate 5 on which the collision occurred is posted with numerous signs indicating the shoulder is a conditional use lane between the hours of 3 and 7 p.m. only.

After defendant was arrested and a blood-alcohol sample was taken, he agreed to talk to California Highway Patrol Officer Eric Lee. Defendant stated he was married; he drank two beers at home between 9:30 and 10:40 p.m. He then left his home in Whittier to go to Norwalk; he did not feel the effects of the beer, and he had not taken any drugs or medication.

A blood sample taken from defendant at 12:37 a.m. on September 10, 1990, roughly two hours after the accident, showed a blood-alcohol level of

.022 and a methamphetamine level of 156 nanograms per milliliter. The latter level was higher than the average sample analyzed. Depending on the amount ingested, methamphetamine can cause restlessness, anxiety, rapid speech, talkativeness, excitability, euphoria, body tremors, insomnia, loss of appetite, dry mouth, tooth grinding, sweating, dilated pupils and elevated pulse and blood pressure. The ingestion of methamphetamine also may cause the impairment of physical coordination. A small amount of a central nervous system stimulant such as methamphetamine induces such euphoria that the user is highly confident he or she can do anything. This results in poor judgment and such behavior as excessive risk-taking and reckless driving.

According to Christina Gonzalez, a criminologist, defendant's maximum blood-alcohol level at the time of the collision would have been .062. For a man defendant's size to have a blood-alcohol level of .022 at 12:30 a.m., he must have consumed approximately three and one-half 12-ounce beers containing 4 to 5 percent alcohol between 9:30 and 10:40 p.m. The ingestion of this amount of alcohol would add to the feeling of euphoria accompanying the ingestion of methamphetamine. Attempting to pass a large tractor-trailer on the shoulder and striking another vehicle is consistent with someone who is impaired by a central nervous system stimulant and alcohol. Defendant had two prior misdemeanor convictions for driving under the influence of alcohol.

The braking system, steering system, tires and wheels of defendant's truck were not contributing causes of the accident. The skid marks left by defendant's truck indicated the steering wheel suddenly had been turned to the left, causing the truck to rotate in a clockwise direction; because the speed of the truck was too great to follow the direction of the wheels, the truck skidded sideways. According to Martin Leis, an accident reconstruction engineer, defendant was traveling at a maximum speed of 58.7 miles per hour at the moment of impact. The force of the collision moved Sanchez's truck 100 feet.

Angelica Flores died from multiple blunt trauma injuries with severe trauma to the head and abdomen. Ernestina Sanchez died from multiple blunt trauma injuries with severe trauma to the head and the fracturing of the upper cervical spine. Ernesto Sanchez, Jr. died from multiple traumatic injuries with severe trauma to the head. Vanessa Figueroa died from traumatic injuries to the head.

Irma Flores suffered severe head injuries. Monica Flores suffered a fractured femur, ankle and pelvis. Christina Sanchez suffered a fractured fibula and multiple abrasions and contusions. Isaac Sanchez and Juan Castaneda

suffered scalp lacerations and contusions and abrasions of the head and scalp.

*Defense*

When defendant was treated at La Mirada Medical Center after the collision, he was alert and cooperative. On an average daily basis, 2,752 vehicles use the conditional use lane outside of the permitted hours of use. In the 3 years preceding 1990, there were 23 accidents on that portion of the freeway, 18 of which occurred outside the hours of permitted use of the shoulder as a traffic lane.

According to Randall Baselt, a forensic toxicologist, defendant's blood-alcohol level at the time of the collision would have been no higher than .05. Given defendant's statement that he had eaten macaroni, peas, carrots and soup at 9:30 p.m. on the night of the collision and then had drunk two beers, Mr. Baselt concluded his blood-alcohol level most likely was .01. According to Martin Balaban, an accident reconstruction engineer, defendant was traveling no faster than 52 miles per hour at the moment of impact.

CONTENTIONS

I

Defendant contends the judgment must be reversed due to prejudicial instructional error.

II

Defendant asserts there is insufficient evidence to support his convictions of driving under the influence and gross vehicular manslaughter.

III

Defendant contends the trial court erred prejudicially in allowing a photograph in which the dead bodies of the victims were depicted to be introduced in evidence.

IV

Defendant further contends the trial court erred in denying his motions for mistrial on the grounds of witness and juror misconduct.

V

Defendant asserts that he was deprived of the effective assistance of counsel.

## VI

Defendant additionally asserts the prosecutor committed prejudicial misconduct. .

## VII

Finally, defendant contends he is entitled to one additional day's credit for presentence custody.

### DISCUSSION

## I

Defendant contends the judgment must be reversed due to prejudicial instructional error. The contention lacks merit.

█ It is said that the failure to object to an instruction in the trial court waives any claim of error unless the claimed error affected the substantial rights of the defendant, i.e., resulted in a miscarriage of justice, making it reasonably probable the defendant would have obtained a more favorable result in the absence of error. (Pen. Code, § 1259; *People* v. *Arredondo* (1975) 52 Cal.App.3d 973, 978 [125 Cal.Rptr. 419]; accord, *People* v. *Rivera* (1984) 162 Cal.App.3d 141, 146 [207 Cal.Rptr. 756].) Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was. Accordingly, it seems far better to state straightforwardly, as we now do, that an appellate court may ascertain whether the defendant's substantial rights will be affected by the asserted instructional error and, if so, may consider the merits and reverse the conviction if error indeed occurred, even though the defendant failed to object in the trial court.

█ Defendant initially challenges the pre-1992 version of CALJIC No. 8.94, which states: "The mere fact that a defendant drives a motor vehicle while under the influence of alcohol and violates a traffic law is insufficient in itself to constitute gross negligence. You must determine from the overall circumstances of the defendant's intoxication or the manner in which he drove, or both, whether his conduct constituted gross negligence." Defendant argues this instruction was disapproved in *People* v. *Bennett* (1991) 54

Cal.3d 1032 [2 Cal.Rptr.2d 8, 819 P.2d 849]. He is mistaken. The court noted that "a driver's level of intoxication is an integral aspect of the 'driving conduct.' . . . The jury should therefore consider all relevant circumstances, including level of intoxication, to determine if the defendant acted with a conscious disregard of the consequences rather than mere inadvertence." (At p. 1038.) This version of CALJIC No. 8.94 correctly allowed the jury to find gross negligence from the overall circumstances of defendant's intoxication. (54 Cal.3d at p. 1039.) While it is true the court suggested modifications in the instruction to forestall future claims of error (*ibid.*), the court expressly held it was not error to give the extant version of CALJIC No. 8.94. (54 Cal.3d at p. 1040.)

■ Defendant next challenges the court's failure to instruct the jury sua sponte in the language of Vehicle Code section 23155, subdivision (a)(1), which creates a rebuttable presumption in a criminal prosecution of this sort that a tested blood-alcohol level of less than 0.05 percent means the defendant was not under the influence of alcohol at the time of the offense. The trial court has a duty to instruct the jury on all principles of law relevant to the issues raised by the evidence (*People* v. *Saddler* (1979) 24 Cal.3d 671, 681 [156 Cal.Rptr. 871, 597 P.2d 130]) and a correlative duty to refrain from instructing on irrelevant and confusing principles of law (*People* v. *Satchell* (1971) 6 Cal.3d 28, 33, fn. 10 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383]).

The prosecution's theory of the case was that defendant was driving under the *combined* influence of alcohol and drugs. Since it is the *combination* that is alleged to have made defendant intoxicated, the level of alcohol alone in his blood is irrelevant. In these circumstances, an instruction couched in the language of Vehicle Code section 23155, subdivision (a)(1), would have been highly confusing to the jurors. Accordingly, it was not error for the court to fail to give such an instruction.

## II

■ Defendant asserts there is insufficient evidence to support his convictions of driving under the influence and gross vehicular manslaughter. We disagree.

■ In assessing the sufficiency of the evidence to sustain a conviction, this court must view the entire record, including all reasonably deducible inferences, in the light most favorable to the judgment. The conviction will

be upheld if it is supported by substantial evidence, i.e., evidence which is solid, credible and of reasonable value. (*People* v. *Barnes* (1986) 42 Cal.3d 284, 303 [228 Cal.Rptr. 228, 721 P.2d 110]; *People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr.431, 606 P.2d 738, 16 A.L.R.4th 1255].) It is only when the evidence, so viewed, would not permit any reasonable trier of fact to have found the defendant guilty beyond a reasonable doubt that the judgment will be reversed. (See *People* v. *Bloom* (1989) 48 Cal.3d 1194, 1208 [259 Cal.Rptr. 669, 774 P.2d 698].)

Vehicle Code section 23153, subdivision (a), provides in pertinent part: "It is unlawful for any person, while . . . under the combined influence of any alcoholic beverage and drug, to drive a vehicle and concurrently do any act forbidden by law, or neglect any duty imposed by law in driving the vehicle, which act or neglect proximately causes bodily injury to any person other than the driver." As used in this provision, the word "drug" "means any substance or combination of substances, other than alcohol, which could so affect the nervous system, brain, or muscles of a person so as to impair, to an appreciable degree, [one's] ability to drive a vehicle in the manner that an ordinarily prudent and cautious person, in full possession of his faculties, using reasonable care, would drive a similar vehicle under like conditions." (CALJIC No. 12.60.) One is under the combined influence of alcohol and a drug "when as a result of drinking such alcoholic beverage and using a drug [one's] physical or mental abilities are impaired so that [one] no longer has the ability to drive a vehicle with the caution characteristic of a sober person of ordinary prudence, under the same or similar circumstances." (*Ibid.*)

Penal Code section 191.5, subdivision (a), provides in pertinent part: "Gross vehicular manslaughter while intoxicated is the unlawful killing of a human being without malice aforethought, in the driving of a vehicle, where the driving was in violation of Section . . . 23153 of the Vehicle Code, and the killing was . . . the proximate result of the commission of an unlawful act, not amounting to a felony, and with gross negligence . . . ." "Gross negligence is the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences. [Citation.] 'The state of mind of a person who acts with conscious indifference[] to the consequences is simply, "I don't care what happens." ' [Citation.] The test is objective: whether a reasonable person in the defendant's position would have been aware of the risk involved. [Citation.]" (*People* v. *Bennett, suppra,* 54 Cal.3d at p. 1036; accord, *People* v. *Ochoa* (1993) 6 Cal.4th 1199, 1204 [26 Cal.Rptr.2d 23, 864 P.2d 103]

That defendant was under the combined influence of alcohol and a drug is apparent from the levels of alcohol and methamphetamine in his

blood and from his conduct. In *People* v. *Gallardo* (1994) 22 Cal.App.4th 489 [27 Cal.Rptr.2d 502], the defendant "burned rubber" upon leaving a parking lot late at night, ran a clearly visible stop sign, accelerating as he did so, then ran a second clearly visible stop sign, consequently colliding with another vehicle. The defendant admitted drinking two beers in the two hours before the incident. He was flushed, his eyes were bloodshot, he had an unsteady gait and the odor of alcohol was on his breath. When tested, his blood-alcohol level was .03, but it most likely was .05 at the time of the accident and may have been as high as .07. Immediately after the accident, he fled on foot; he later gave investigators a false name. (At pp. 493-494.) The court found this to be sufficient evidence to support the conclusion the defendant was driving under the influence. (*Id.* at p. 494.)

In the instant matter, defendant had a similar blood-alcohol level and additionally had a significant amount of methamphetamine in his system. After the accident, defendant was largely incoherent and confused; his eyes were bloodshot and he had the odor of alcohol on his breath. He acknowledged drinking two beers in the hour before the collision, but denied taking any medication or drugs. Due to the head injury he suffered in the accident, the usual field sobriety tests could not be performed. That he passed the less reliable finger-count test is insignificant given the level of methamphetamine in his blood.

When tested almost two hours after the accident, defendant had a blood-alcohol content of .022. There was expert evidence he would have had a maximum blood-alcohol content of .062 and probably had one of at least .05 at the time of the accident. He must have consumed at least three and one-half 12-ounce beers to have a blood-alcohol level of .022 when he was tested. He had 156 nanograms of methamphetamine per milliliter in his blood; this is a higher level than that found in the average sample tested. Methamphetamine makes people jittery and may cause an impairment of physical coordination. In addition, small amounts of methamphetamine induce feelings of euphoria and invincibility which may lead to extreme risk-taking. The level of alcohol defendant consumed would add to the feeling of euphoria.

Immediately before the accident, defendant had entered the conditional use lane, essentially the shoulder, of Interstate 5, at a time when its use was unauthorized, to pass a large tractor-trailer rig on the right. While passing the tractor-trailer, defendant was traveling at a speed of 58.7 miles per hour or more. He was aware that use of the conditional use lane was not authorized at that time of night and the lane was clearly marked with

numerous signs so indicating. When defendant entered the conditional use lane, the lanes to the left of the tractor-trailer were free of traffic. The pickup truck with which defendant collided was stopped in the conditional use lane, using it as the shoulder of the freeway (while there was a gravel shoulder to the right of this, it had a significant slope). The truck's taillights and license plate light were illuminated, yet defendant failed to see it in time to apply his brakes; he could only react by turning the steering wheel sharply to the left, producing a sliding skid. There was expert testimony his driving was consistent with the impairment caused by a central nervous system stimulant.

As in *Gallardo*, based on the ample evidence of defendant's conduct before the accident, lying about his ingestion of drugs after the accident (supporting an inference of consciousness of guilt), his objective blood-alcohol and methamphetamine levels and symptoms of alcohol and drug use, there is substantial evidence from which the jury could conclude beyond a reasonable doubt that he was driving under the combined influence of alcohol and a drug. In passing a large tractor-trailer rig on the right when the lanes to the left were free of traffic, using what is essentially the shoulder of the road when he was not authorized to do so and, consequently, driving at what obviously was an unsafe speed and in failing to see the pickup truck as he approached it, defendant clearly was not driving with the caution or ordinary prudence characteristic of a sober person under similar circumstances.

Additionally, from prior brushes with the law, defendant was aware of the risks attending driving while under the influence. Given this awareness, as well as defendant's highly unsafe driving and extreme inattentiveness while under the influence, the jury reasonably could conclude he displayed a conscious indifference to the consequences of his actions and thus was grossly negligent. (See, e.g., *People* v. *Hoe* (1958) 164 Cal.App.2d 502, 508 [330 P.2d 907].)

### III-VII*

. . . . . . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed. The abstract of judgment is modified to award defendant 522 days of presentence custody credit and the trial court is

---

*See footnote, *ante*, page 1241.

directed to forward a copy of the amended abstract to the Department of Corrections.

Ortega, J., and Masterson, J., concurred.

A petition for a rehearing was denied July 28, 1994, and appellant's petition for review by the Supreme Court was denied October 19, 1994.