Filed 8/18/15  P. v. Leiper CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. EDWARD LEIPER, Defendant and Appellant. | D065728 (Super. Ct. No. SCD239747) |

APPEAL from a judgment of the Superior Court of San Diego County, Frederic L. Link, Judge.  Affirmed.

Raymond Mark DiGuiseppe, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Ryan H. Peeck, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Edward Leiper of second degree murder (Pen. Code,[1] § 187, subd. (a); count 1) and three counts of exhibiting a deadly weapon (§ 417, subd. (a)(1); counts 2-4). The jury also found that Leiper used a deadly and dangerous weapon (a knife) in the commission of count 1. (§ 12022, subd. (b)(1).)

The superior court sentenced Leiper to prison for 15 years to life, plus an additional year for the weapon enhancement to count 1.

Leiper appeals, contending the trial court committed reversible error by improperly instructing the jury. We affirm.

FACTUAL BACKGROUND

Prosecution

By February 2012, Leiper was a regular at the Sunshine Company Saloon (Saloon). On February 6, 2012, he arrived at the Saloon in time for the 5:00 p.m. happy hour. While drinking at the bar, Leiper made multiple, unwelcome, attempts to speak with other patrons.

Leiper loudly began talking to one patron about growing and selling marijuana. When she told him to speak quietly, he got mad at her and told her "to fuck off." Later that night, he apologized and told her that "he was having a weird day."

Leiper approached another patron, Stephen Ward, and told him that he sold "dope" to earn money. The tone of the conversation "changed quite a few times," and Ward was repeatedly called upon to calm Leiper down. Ward proved unsuccessful, and Leiper

_____

[1]      Statutory references are to the Penal Code unless otherwise specified.

2

threatened to stab Ward "more than two or three" times. Ward tried to ignore Leiper's threats, but he placed his knife on the barstool between them and said something to the effect of, "Now do you believe me?"

Leiper also approached another patron, Antonio Silva. He asked him to teach him something, to which Silva replied that he could only teach him about his belief in God. Leiper left and went back to his seat. However, he subsequently picked up his knife and showed it to Silva, while holding it above his head. He then pointed outside. Silva reported this to one of the bartenders. While he was doing that, and the bartender's back was turned, Leiper again displayed the knife to Silva. By the time the bartender turned around, Leiper put the knife away. Eventually, Leiper was told to leave.

Corwin Street was a bouncer at the Saloon. When he overheard Leiper swearing at the female patron, Street told Leiper to finish his drink and leave. Before Leiper left, Street became aware of another incident involving Leiper and heard one of the bartenders telling him to leave. Street approached and told him to leave, but that he could return another time. Leiper replied, "You might as well call the fucking cops right now." Street subsequently noticed that Leiper was holding a knife. Leiper eventually left the bar, but continued to be aggressive and yelled racial slurs at Street.

After Leiper left the Saloon, he ended up in the alley between two bars: Winston's and Arizona Cafe. At that time, a group of skateboarders was socializing, playing with a hula hoop, a guitar, and skateboards, and smoking marijuana in the same alley.

With his knife out, Leiper approached the group and said, "Locals only, no trolls, this is Dago Mob," and told them to leave. David Price, a bystander in the alley, heard

3

Leiper repeatedly yell, louder and louder, "Get out of Diego, I am gonna kill you troll." Leiper said he was going to clean the streets of homeless people. The group initially thought he was joking. Leiper then asked whether anyone in the group "had any marijuana on" them. Leiper had his knife out with the blade pointed up. Within a minute of Leiper's arrival and his initial threat, everyone left except for Andrew Bazan.

Eric Diaz, one of the people in the group, initially remained and asked if he could get his jacket. He was afraid of being stabbed and held his skateboard against his chest for protection from Leiper's knife. He heard Leiper say, "Dago Mob," and heard Bazan reply, "MS-13." "That's when [Bazan] was stabbed." Leiper cut Bazan across his abdomen, "on the side of his belly button," with the knife. Then Leiper calmly told Diaz, "Your friend's just been stabbed. I think you should take him to the hospital." Leiper chased Diaz away before running away, himself, while yelling. Prior to the stabbing, nobody made any aggressive movements or swung their skateboards at Leiper.

Justin Reno, a resident in a second floor apartment above Arizona Cafe, had a view of the parking lot where the stabbing occurred. He heard someone say, "He has a knife." When Reno looked outside, he saw two people fighting, in what appeared to be "a messed up brawl[.]" He saw Leiper throw the first punch and the stabbing happened "very quick[ly]." Nobody was near Leiper with a skateboard, Bazan did not have a skateboard, and Reno did not hear anyone threatening Leiper.

Bazan stumbled down the alley and bumped into the back of a taxicab. He managed to come over to the window and ask the driver for help. His shirt was covered in blood and "a lot of his innards or guts . . . were coming out as well. It was a pretty bad

4

. . . one." After asking for help, Bazan fell down to the ground. The taxicab driver, among others, dialed 911. Dave Price, one of the bystanders in the alley, and his companion, briefly followed Leiper while calling 911.

Bazan was still conscious when paramedics arrived. He told them that he had been stabbed. He suffered a laceration of his bowels, a grapefruit-sized portion of which were protruding outside of his body. He was transported directly to an operating room.

Bazan endured 10 surgeries and suffered extensive complications, which resulted in portions of his small and large intestines being removed. After a prolonged hospitalization, he was transferred to hospice care because he "had no viable intestine left" and "his situation . . . was incompatible with life." Bazan subsequently died from complications of the stab wound.

Police interviewed Leiper following the incident. He admitted that there was no excuse or explanation for what he did.

Defense

Leiper testified that he arrived at the Saloon around 5:00 p.m. on February 6, 2012. Leiper had his knife in the pocket of his sweatshirt. He bought the knife about a month earlier for protection. After a couple of beers, he had a "friendly buzz" and felt like talking to other people. He tried to talk with Silva, but the conversation did not go very well because Silva brushed him off. This did not make him angry. As Leiper drank more, he started acting "like an ass," by "flash[ing] around" and "show[ing] off" his knife because he thought it was a "pretty cool looking knife." Specifically, he was "putting it up in the air, putting it on the bar, showing it to people next to [him]." Leiper also talked

5

to Ward during this time, though he did not recall having shown the knife to Ward directly; he just "generally" had it out and on the barstool next to Ward at some point. Leiper was not trying to be aggressive or to threaten anyone, though someone could have taken his conduct as a sign of aggression.

Eventually, Leiper realized he was making people uncomfortable, so he put the knife away and just kept to himself. He did not recall speaking to a woman patron about marijuana or telling her to "fuck off."

About an hour after he had put the knife away, Leiper noticed Silva talking to a bartender, who then looked over at Leiper and asked if he was flashing a knife around. Leiper, "kind of disappointed" and a "little irritated" because he thought the knife was never a real issue, looked at Silva and said, "Are you serious?" The bartender then asked Leiper to leave. He put his beer down and walked out of the bar. He turned around at the entrance because the bartender was talking to him, although he did not recall what they said to each other. Street then got in the middle of the conversation, which sparked "sort of a confrontation" with Street, though Leiper was not being aggressive or lashing out. Leiper did not recall having threatened the bartender or Street or having referred to Street in racially derogatory terms. He started walking away, but Street kept saying things to him and coming toward him. Street's behavior was "confusing" and "intimidating," as if he was trying to "antagoniz[e]" or "provok[e]" Leiper. Leiper reacted defensively, by stepping back and pulling out the knife "so [Street] wouldn't put his hands on [Leiper]."

Leiper continued walking away from the bar. He put the knife away, and eventually entered the alley between Winston's and Arizona Cafe, where he saw a large

6

group (eight to 10 people) just beyond Winston's. Some of them were sitting on skateboards, others were holding skateboards. He noticed one of them smoking "weed." Leiper approached and asked for a "hit" "in a goofy stoner voice," thinking "it would be nice to smoke some weed and forget about being kicked out of [his] favorite bar." He was "disappointed" and "a little upset" about that incident, but had "just let it go" before he reached the group. The group gave a "negative" response to his request and he could tell that he was "intruding upon" their activity. Then, one of the males very close to him who was holding a skateboard, started "creeping behind him" and got into a "side stance" while staring directly at him with eyes "as wide as bottle caps." Leiper "got a really bad feeling." Based on the male's actions and the generally negative response from the group, Leiper believed the male was "going to come around and hit [him]" with the skateboard. He did not believe he had the option of just leaving." So he pulled out his knife, which he held down by his side. This was not an effort to hurt or lash out at anyone, but a defensive move in response to his belief in a "good possibility" of a threat. The alcohol he consumed had also made him feel "vulnerable," like he "couldn't defend [him]self properly." In response to seeing the knife, the male with the skateboard backed off.

Then another male in the group who was about three feet away "grabbed his skateboard and lifted it up and started making motions like he was going to hit [Leiper] with the board." Leiper was "wondering who was gonna do what" and just "stood [his] ground" without lashing out, but keeping the knife at his side until this male eventually backed away as well. Leiper still did not feel like he could just leave because several other people were around him. He felt threatened and "didn't want to take a chance."

7

"Panicked," and not knowing "who was going to attack [him] from which direction," he moved toward each of them with the knife pointed outward to "back them off." Leiper also referred to "Dago Mob" (which was a "biker club") and used some profanities in an effort to intimidate them. They all eventually backed off, running away in different directions.

Leiper would have left the scene, but then he heard someone "yelling and running up behind" him. He turned around with his knife pointed "straightforward," and saw someone (Bazan) "closing in on" him and "getting really close." When Bazan got "right up against" him, Leiper "just reacted." Leiper did not recall stabbing Bazan. He could have swung the knife or Bazan could have run into it; he did not know Bazan had been stabbed until after the fact. All he recalled about that moment is being "scared to death." When Leiper realized he had stabbed Bazan, he was shocked and "couldn't believe it." He feared being attacked by someone else, so he fled the scene backing people away as he ran. He briefly turned around at one point to chase away someone following him whom he believed was part of the same group. He then continued on, "pitch[ing]" the knife in a bush as he ran away because he was "disgusted" by having it in his hand.

Over a month later, a few days after Bazan had died, homicide detectives interviewed Leiper at his father's home. At the time, Leiper was still under the impression that Bazan had just been seriously injured in the incident. He relayed he was "in a really bad time" of his life when he was homeless, drinking alcohol heavily, and smoking weed. He had acted like "an ass" in the bar that night, although he did not specifically recall having displayed the knife while he was there. Leiper said he was

8

carrying the knife for protection, explaining:  "[T]he only reason why I would carry that knife is because just in case I got into a situation where I'm either outnumbered or whatever and the lifestyle I was living [i.e., being homeless] wasn't very — really a pleasant lifestyle . . . ."  By the time he encountered Bazan later outside the bar, Leiper was "extremely drunk" — in a mindset where "you see things a little differently."  In regard to the stabbing, Leiper said:  "I remember one kid raised a skateboard at me and another kid so I had this one kid on this side and one kid on this side and . . . [¶] [a]nd I just remember — I don't know all the details, but I just remember a skateboard being lifted up at me and I just pulled out the knife and I started swinging.  I, I panicked and then I realized what I did and I got scared and I ran off . . . ."  He had gotten rid of the knife along the way because he was scared.

Leiper turned himself in a few days later because he knew "it wasn't fair to everyone else."  Leiper said "there's was no excuse or explanation" for what he did, it "wasn't right," and he "still [didn't] understand" it himself.  He wanted to "take accountability" for his actions since "[t]here's no denying" what he did.  However, he was not just trying to "create a defense" in explaining the threat he perceived:  He "remembered seeing a skateboard being lifted at [his] head" and, although that "doesn't mean what [he] did was right," he believed "[i]t is a defense."  Leiper went on to say:  "If you knew my morals and you knew who I really was, you would know that the last thing I want to do is go out there and hurt someone, let alone potentially end someone's life.  Okay, that's bad."  Alcohol was "a huge factor" because "honestly [he] d[id]n't think [he] would ever do those things if [he] wasn't in that state of mind."  The detectives then

9

informed him that Bazan had died. Leiper said "no way," "[o]h my gosh," and he certainly felt bad about Bazan's death.

Leiper testified that at the time of this interview, he believed the charges had been dropped and that Bazan was going to be fine until the detectives told him at the end that Bazan had died. Regarding his statements to the detectives that what he had done was wrong and there was no excuse for it, he testified that he had been referring to his conduct at the bar. He reiterated that it was "never [his] intention or objective" to hurt anyone, and that his "objective was to back them off, to distance themselves from me so I couldn't get hurt."

Durrell Chambers, a three-time convicted felon, who had known Leiper since childhood and still considered him a friend, testified that on February 8, 2012, two days after the stabbing incident, he was in custody at the central jail in downtown San Diego for illegal drug possession. While in a holding cell, Chambers heard one of the other inmates talking loudly about a recent incident in Ocean Beach in which the inmate's friend was stabbed. Chambers believed the inmate was referring to the incident involving Leiper. The inmate was making "a bunch of like crazy comments about" the stabbing. At one point, he said "Eddie . . . like was walking down the alley, they seen . . . Eddie, Eddie said something to them, they were going to jump him, you know, they had skateboards, they were willing — they were willing to jump him." The inmate had not specifically referred to Leiper by name, but Chambers believed he was referring to Leiper. Chambers told the inmate to stop talking because he was talking about

10

Chambers's friend and the inmate responded that "he deserves to go down for" the stabbing.[2]

## DISCUSSION

Leiper claims the court erred by failing to properly instruct the jury on the subjective standard of imperfect self-defense. Specifically, he asserts CALCRIM No. 3474 was erroneous and the court failed to "clarify . . . that the right to imperfect self-defense continues so long as the real or apparent threatened danger continues to exist." We disagree.

This is a homicide case. As such, the court instructed the jury with, among others, multiple instructions regarding the killing of another: first degree murder (CALCRIM No. 520); second degree murder (CALCRIM No. 521); effect of provocation to reduce first degree murder to second degree murder or murder to manslaughter (CALCRIM No. 522); heat of passion voluntary manslaughter (CALCRIM No. 570); imperfect self-defense voluntary manslaughter (CALCRIM No. 571); perfect self-defense (CALCRIM No. 505); and the right to self-defense only exists in the presence of danger (CALCRIM No. 3474).

Here, Leiper takes issue with CALCRIM No. 3474, which states: "The right to use force in self-defense or defense of another continues only as long as the danger exists or reasonably appears to exist. When the attacker withdraws or no longer appears

---

2     Diaz admitted to have been in custody at the central jail on February 8, 2012 after he was arrested for selling marijuana. However, he testified that he did not recall having made any comments about the stabbing at that time.

capable of inflicting any injury, then the right to use force ends." We note that Leiper's trial counsel did not object to any of the instructions provided to the jury. Nor did he request any specific instruction relating to imperfect self-defense that the court refused to give. The first time Leiper challenges any jury instruction is on appeal.

By failing to object to or request a specific jury instruction at trial, Leiper forfeited this claim on appeal, unless the claimed error affected Leiper's substantial rights. (See § 1259; *People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 7.) "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim -- at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.) We conclude that Leiper has not shown that the claimed error affected his rights; thus, he has forfeited his claim.

We review a claim of instructional error de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) In determining whether error has been committed in giving jury instructions, we consider the instructions as a whole and assume jurors are intelligent persons, capable of understanding and correlating all jury instructions which are given. (*Ibid.*) " 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' " (*Ibid.*) "The crucial assumption underlying our constitutional system of trial by jury is that jurors

12

generally understand and faithfully follow instructions." (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.)

Here, Leiper does not maintain that CALCRIM No. 3474 is an incorrect statement of law. Nor could he. The right to the use of force continues only as long as the danger reasonably appears to exist. (*People v. Martin* (1980) 101 Cal.App.3d 1000, 1010; *People v. Perez* (1970) 12 Cal.App.3d 232, 236.) This is precisely what CALCRIM No. 3474 tells the jury.

However, Leiper claims here, for the first time, that CALCRIM No. 3474 was "erroneous on its face insofar as it implies that *any* claim of self-defense (whether a claim of perfect self-defense or simply a claim of imperfect self-defense) is cut off unless the continuing nature of the perceived threat is *real* or *objectively reasonable*." (Original italics.) He points out that the jury could have been confused by CALCRIM No. 3474 and would have not given "proper consideration to the doctrine of imperfect self-defense since that would have necessarily involved applying a *subjective* standard in assessing the continuing nature of the threat." (Original italics.) Put differently, Leiper argues that CALCRIM No. 3474 somehow undermines the imperfect self-defense jury instruction the court provided, which, had the jury properly considered, it could have found him guilty of voluntary manslaughter, instead of murder. (See *People v. Thomas* (1990) 219 Cal.App.3d 134, 145 (*Thomas*).)

Manslaughter is a lesser included offense of murder. (*People v. Lewis* (2001) 25 Cal.4th 610, 645.) A defendant who kills in an actual but objectively unreasonable belief that he was in imminent danger of death or great bodily injury is said to have done so

13

while acting in imperfect self-defense. (*Ibid*.) However, such a person, in spite of his actual belief in the act's necessity, nevertheless " 'kills unlawfully.' " (*Thomas*, *supra*, 219 Cal.App.3d at p. 145.) "[T]he 'imperfect self-defense' instruction is not a self-defense instruction at all. It merely removes the element of malice aforethought" from the murder charge, reducing the crime to voluntary manslaughter. (*Ibid*.) In contrast, to constitute "perfect self-defense," i.e., to exonerate the person completely, a defendant must actually and reasonably believe in the need to defend himself. (See *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 (*Humphrey*).) Put differently, a person who kills in perfect self-defense has not violated the law, but a person who kills, under an imperfect self-defense theory, has acted unlawfully. Therefore, a person has the right to engage in perfect self-defense, but no such right to engage in imperfect self-defense.

CALCRIM No. 3474 speaks to the right of self-defense. A person no longer has that right once an assailant stops the attack, flees, or no longer appears capable of attacking. (*People v. Martin*, *supra*, 101 Cal.App.3d at p. 1010; *People v. Perez*, *supra,* 12 Cal.App.3d at p. 236.) Because CALCRIM No. 3474 addresses a defendant's right to engage in self-defense and when that right ceases to exist, it only pertains to perfect self-defense. (Cf. *Humphrey*, *supra*, 13 Cal.4th at p. 1082 ["For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend."].) As such, CALCRIM No. 3474 does not impact a defendant's claim of imperfect self-defense whatsoever.

At trial, the court instructed the jury under CALCRIM No. 571 [Voluntary Manslaughter: Imperfect Self-Defense or Imperfect Defense of Another -- Lesser Included Offense], which states in relevant part:

> "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense. [¶] If you conclude the defendant acted in complete self-defense, his action was lawful and you must find him not guilty of any crime. The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable. [¶] The defendant acted in imperfect self-defense if: 1. The defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury; [¶] AND [¶] 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; [¶] BUT [¶] 3. At least one of those beliefs was unreasonable. [¶] Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. [¶] In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant. [¶] . . . [¶] The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense. If the People have not met this burden, you must find the defendant not guilty of murder."

Accordingly, the jury was properly instructed regarding imperfect self-defense. Leiper has not pointed to any indication in the record that the jury did not understand CALCRIM No. 571 or otherwise ignored that instruction because it also received CALCRIM No. 3474.

CALCRIM No. 3474 correctly states the law. It does not diminish, alter, or otherwise undermine CALCRIM No. 571. As discussed above, we consider the instructions as a whole and assume jurors are intelligent persons, capable of understanding and correlating all jury instructions which are given. (*People v. Ramos*,

15

*supra*, 163 Cal.App.4th at p. 1088.)  CALCRIM No. 571 instructed the jury about imperfect self-defense.  The jury rejected this theory and found the prosecution proved that Leiper stabbed Bazan with requisite intent and malice to be guilty of second degree murder.  Leiper does not challenge the sufficiency of the evidence to support that conviction.  On the record before us, we find no error.

Because the jury instructions were correct as given, we see no grounds on which to determine Leiper received ineffective assistance of counsel for his trial counsel's failure to object to any of the instructions or request a clarifying instruction.

DISPOSITION

The judgment is affirmed.


HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


McDONALD, J.