Filed 11/7/25  P. v. O'Neil CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C101938 |
| v. | (Super. Ct. No. 18FE022948) |
| OMARI O'NEIL, | |
| Defendant and Appellant. | |

A jury found defendant Omari O'Neil guilty of voluntary manslaughter and unlawful possession of a firearm.  Defendant admitted two prior strike convictions.  The trial court sentenced him to a determinate four years plus 33 years to life in state prison, a sentence that included an upper term.

Defendant now contends (1) substantial evidence did not support instructing the jury on contrived self-defense, (2) the contrived self-defense instruction was legally incorrect, and (3) the trial court prejudicially erred in imposing the upper term based on

1

aggravating circumstances not proven in accordance with Penal Code section 1170, subdivision (b).[1]

We conclude defendant's first two contentions lack merit, but we find merit in his third contention asserting sentencing error. We will vacate defendant's sentence and remand the matter to the trial court for further litigation of the aggravating circumstances and resentencing.

BACKGROUND

In 2024, the People charged defendant with murder (§ 187, subd. (a)) and unlawful possession of a firearm (§ 29800, subd. (a)(1)). The People alleged defendant intentionally and personally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)) and that he had two prior strike convictions. At trial, witnesses gave varying accounts of the events leading up to the victim's death.

Matthew N. testified that defendant drove him in a Dodge Challenger to a cul-de-sac off Rio Linda Boulevard to buy heroin. The victim, who had previously had an issue with Matthew, was at that location with a group of people. The victim approached the front passenger side of the Challenger where Matthew was sitting in an attempt to confront Matthew. Defendant told the victim something to the effect of "fuck off" and "I'll come back and shoot up this whole block." The victim went to the front driver's side and hit defendant, breaking his glasses. Defendant sped off.

Defendant switched cars, getting into a Mustang. Matthew testified he thought defendant was upset and was going to go back to fight the victim. Matthew explained that this was "just how things are in that community. Like, if somebody does that to you, you usually go back or you fight them" because it is a "disrespect issue." Defendant told Matthew they were going back to the cul-de-sac; they drove separately (Matthew in the

_____

[1] Undesignated statutory references are to the Penal Code.

2

Challenger and defendant in the Mustang). Matthew waited outside the cul-de-sac near Rio Londa Boulevard.

From his vantage point, Matthew saw defendant get out of the Mustang and the victim walk up to defendant. Defendant pulled out a gun and started shooting. The victim went towards defendant while defendant was shooting.

Jamie V. testified that on December 1, 2018, a Dodge Challenger arrived at the cul-de-sac off Rio Linda Boulevard. Jamie and the victim walked up to Matthew because there was an issue between the victim and Matthew. Defendant then said, "Niggas like you, I shoot – I bust caps at niggas that walk up to my window like that." The victim went to the other side of the vehicle and "socked [defendant] straight dead in the right eye." Defendant took off, but returned to the cul-de-sac five to 10 minutes later in a Mustang and got out of the car. The victim was standing in the middle of the cul-de-sac. Jamie could see that defendant was holding a gun. Jamie testified he could not remember what defendant said when he got out of the car. When shown a transcript from the preliminary hearing, Jamie acknowledged his prior testimony that defendant said, "I'm gonna bang you, motherfucker. Why did you try to stab me in my eye?"

Jamie initially testified that the victim started walking toward defendant in a threatening way. But Jamie subsequently said he could not say that the victim was walking aggressively. Jamie also testified on direct examination that defendant was standing by the driver's side door when defendant started shooting. But on cross examination, Jamie testified defendant went to the passenger side of the vehicle to begin shooting. When pressed on this inconsistency, Jamie said "the gun had multiple bullets in it, so you could shoot at the beginning, walk around, and shoot again." The victim pleaded for his life as he went down a few feet from the center of the cul-de-sac.

Frank G. testified he was homeless at the time of the incident and lived on the bike trail near where the victim was killed. Frank saw the victim running around a car saying, "Don't kill me" or "Don't shoot me." He also saw a man who he knew by the nickname

"O" chasing the victim around the car with a gun.[2] Defendant was pointing the gun at the victim while chasing him, and eventually reached over the car and shot the victim. Defendant went to the side of the car and shot the victim again. Defendant then walked up to the victim and shot him in the face.

Defendant testified that he and Matthew went to the cul-de-sac off Rio Linda Boulevard in a Challenger to purchase heroin. According to defendant, the victim started screaming at Matthew to get out of the car. Defendant said in response "Back up from this car. Ain't nobody flexing nobody in this car." The victim came over to the driver's side and punched defendant in the face. Defendant drove off. Matthew told defendant the victim had attacked him recently.

Defendant returned to the cul-de-sac in a Mustang with a firearm, which he claimed he brought to protect himself. While still in the car, defendant tried to get the attention of the heroin seller. But defendant got punched in the face a second time and his glasses broke. Defendant threw his car keys at the person who punched him. He wanted to leave but he no longer had the car keys.

Defendant grabbed the gun and jumped out of the car. He testified he saw the victim in front of him and he was coming toward defendant. According to defendant, the victim was holding a blade and looking "crazy" and "[a]ll amped up." The victim said, "Do it then, nigga." At no point did the victim beg for his life. Defendant was "backpedaling" and fired warning shots at the ground to get the victim to back off. The victim chased defendant around the car, swinging the blade at defendant's face. Thinking his life was in danger, defendant shot the victim.

---

[2] Other testimony established that defendant went by the nickname "O."

The trial court instructed the jury with versions of CALCRIM No. 505 [justifiable homicide: self-defense or defense of another] and CALCRIM No. 3472 [right to self-defense: may not be contrived].

CALCRIM No. 505 states in relevant part: "The defendant is not guilty of murder or manslaughter if he was justified in killing someone in self-defense. The defendant acted in lawful self-defense if: [¶] (1) The defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury. [¶] . . . [¶] . . . The defendant must have believed there was imminent danger of death or great bodily injury to himself. Defendant's belief must have been reasonable and he must have acted only because of that belief."

CALCRIM No. 3472 states in relevant part: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."

The jury found defendant not guilty of murder but guilty of the lesser included offense of voluntary manslaughter. (§ 192, subd. (a).) The jury found true that defendant personally used a firearm in committing that offense. (§ 12022.5, subd. (a).) The jury also found defendant guilty of unlawful possession of a firearm. Defendant admitted two prior strike convictions.

The trial court sentenced defendant to 33 years to life in prison on the voluntary manslaughter conviction, a sentence that consisted of the upper term of 11 years, tripled for the prior strikes. The trial court also imposed the middle term of four years for the associated firearm enhancement. In addition, the trial court sentenced defendant to six years (the upper term, doubled for the prior strikes) on the unlawful possession of a firearm conviction, but stayed that sentence under section 654. The trial court imposed the upper term based on the following aggravating circumstances: (1) defendant's prior convictions were numerous or of increasing seriousness (Cal. Rules of Court, rule 4.421(b)(2)); (2) defendant previously served a prior prison term (*id.*,

5

rule 4.421(b)(3)); and (3) defendant was on probation or parole at the time of the offense (*id.*, rule 4.421(b)(4)). The trial court acknowledged that the aggravating circumstances had not been proven to the jury, but it concluded it could rely on the certified record of conviction and that the issue need not be submitted to a jury to support the imposition of the upper term.

DISCUSSION

I

Defendant contends there was insufficient evidence to support instructing the jury on contrived self-defense.[3]

It is error to give an instruction that has no application to the facts of the case; there must be substantial evidence to support the instruction. (*People v. Cross* (2008) 45 Cal.4th 58, 67; *People v. Campbell* (1994) 25 Cal.App.4th 402, 408.) In determining whether substantial evidence supports a jury instruction, "we view the evidence most favorably to the judgment presuming the existence of every fact that reasonably may be

---

[3] The People argue defendant forfeited his claims of instructional error by failing to object in the trial court. Defendant counters that the claims are not forfeited, but if we conclude otherwise, his trial counsel was ineffective in failing to object. "Generally, failure to object does not waive an instructional error on appeal if the instruction was an incorrect statement of law or the defendant's substantial rights were affected." (*People v. Vega* (2015) 236 Cal.App.4th 484, 495; see also § 1259.) "Substantial rights" are equated with errors resulting in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Arredondo* (1975) 52 Cal.App.3d 973, 978.) "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim -- at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.) Accordingly, we will address the merits to ascertain whether the alleged errors affected defendant's substantial rights.

deduced from the record in support of the judgment." (*People v. Jantz* (2006) 137 Cal.App.4th 1283, 1290.)

Here, there is evidence that at the first confrontation between defendant and the victim, defendant said something like, "I'll come back and shoot up this whole block." There is also evidence that defendant subsequently returned to the scene, exited his car with a gun, and said, "I'm gonna bang you." In addition, there is evidence that the victim walked aggressively toward defendant (in Jamie's version) or went toward defendant with a blade in his hand (in defendant's version). From that evidence, a jury could rationally conclude that defendant provoked a conflict and aggressive response from the victim to create an excuse to use force. Substantial evidence supports the instruction.

Resisting this conclusion, defendant argues the testimony establishes one of two scenarios: (1) defendant initiated the attack and the victim took no threatening action in response and only begged for his life; or (2) defendant returned to the cul-de-sac and, without provoking the victim, was attacked by the victim with a blade. In either scenario, the argument goes, the contrived self-defense instruction is unwarranted. But as we have explained, the evidence could support a third scenario. A factfinder could believe one part of a witness's testimony and disbelieve other parts. (See *People v. Shivers* (1956) 139 Cal.App.2d 275, 277 ["The jury did not have to believe the testimony of defendant . . . ; they could reject all or believe part and disbelieve the remainder"]; see also CALCRIM No. 226 ["You may believe all, part, or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe"].)

Defendant insists he cannot be stripped of his right to self-defense because "[h]e had every right to return to the cul-de-sac notwithstanding what had occurred minutes earlier" and "he had every right to arm himself when he did so." But defendant's argument disregards other evidence in the record, such as the testimony that, minutes

7

before returning to the scene with a gun, defendant said, "I'll come back and shoot up this whole block."

Because substantial evidence supported instructing the jury with CALCRIM No. 3472, there was no instructional error and defendant's substantial rights were not affected by providing the instruction.

## II

Defendant next claims the version of CALCRIM No. 505 given to the jury was erroneous. He argues that, under sections 197 and 198, if a party used self-defense to resist an "actual attack," as opposed to a "perceived attack," section 198 does not require a party to act out of fear alone.

Section 197 provides in relevant part: "Homicide is . . . justifiable when committed by any person in any of the following cases: [¶] (1) When resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person. [¶] (2) When committed in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony, or against one who manifestly intends and endeavors, in a violent, riotous, or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein. [¶] (3) When committed in the lawful defense of such person, or of a spouse, parent, child, master, mistress, or servant of such person, when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished; but such person, or the person in whose behalf the defense was made, if he or she was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed."

Section 198, in turn, states that "[a] bare fear of the commission of any of the offenses mentioned in *subdivisions 2 and 3 of Section 197*, to prevent which homicide may be lawfully committed, is not sufficient to justify it. But the circumstances must be

8

sufficient to excite the fears of a reasonable person, and the party killing *must have acted under the influence of such fears alone*." (Italics added.)

Defendant argues that section 198's limitation of justifiable homicide to those instances in which the perpetrator acted solely because of fear applies only to situations implicating self-defense under subdivisions (2) and (3) of section 197. He submits this case implicates self-defense under section 197, subdivision (1), and therefore there was no requirement that he kill due to fear alone. We disagree.

In *People v. Trevino* (1988) 200 Cal.App.3d 874 (*Trevino*), the appellate court concluded that CALJIC No. 5.12 -- the predecessor instruction to CALCRIM No. 505 -- was a correct statement of law on self-defense. (*Trevino*, at p. 879.) Raising the same argument defendant raises here, the defendant in *Trevino* argued the trial court erred by giving CALJIC No. 5.12 because section 198 only applies to subdivisions (2) and (3) of section 197, and therefore the rule in CALJIC No. 5.12 should only be applied in cases where the danger was apparent or inchoate, rather than those instances in which the danger was real and imminent. (*Trevino*, at pp. 877-878.) Disagreeing, the appellate court found "the law to be settled that '[t]o be exculpated on a theory of self-defense one must have an honest and reasonable belief in the need to defend. [Citations.] A bare fear is not enough; "the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone." [Citation.]' [Citations.] Hence, an instruction that states that the party killing must act under the influence of such fears alone, is a correct statement of the law." (*Id*. at pp. 878-879, italics omitted.) The court in *Trevino* acknowledged that the law does not require "an absence of any feeling other than fear," it simply requires "that the party killing *act out of fear alone*." (*Id*. at p. 879.) If anger or other emotions are "causal factors in his decision to use deadly force," "the homicide cannot be justified on a theory of self-defense." (*Ibid*.) Thus, the court concluded, because the form instruction does not "eliminate a feeling of anger or any other emotion so long as that emotion was not part of

9

the cause of the use of deadly force," the instruction is a correct statement of the law on self-defense. (*Id*. at pp. 879-880.)

The California Supreme Court endorsed *Trevino*'s holding in *People v. Nguyen* (2015) 61 Cal.4th 1015. There, the defendant shot and killed a rival gang member who, carrying a gun, approached the car the defendant was driving. (*Id*. at p. 1043.) The defendant contended that the evidence established self-defense as a matter of law. (*Id*. at p. 1042.) The trial court instructed the jury with CALJIC No. 5.12. (*Nguyen,* at p. 1043.) The Supreme Court quoted section 197, subdivisions (1) and (2), section 198, and *Trevino*'s holding that " 'an instruction which states that the party killing must act under the influence of such fears alone, is a correct statement of the law.' " (*Nguyen,* at p. 1045, quoting *Trevino, supra*, 200 Cal.App.3d at p. 879.) The court explained: "*Trevino* clarified that this rule does not 'imply that a person who feels anger or even hatred toward the person killed, may never justifiably use deadly force in self-defense,' " only that the party killing act out of fear alone. (*Nguyen,* at p. 1045.) The court concluded that "it was for the jury to decide whether [the] defendant acted out of fear alone when he shot and killed [the victim]." (*Id*. at p. 1045.)

The Supreme Court added that the "defendant did not argue in the trial court, nor has he argued on appeal, that the jury should have been instructed that acting based on mixed motives is permissible so long as reasonable fear was the but-for cause of his decision to kill. We therefore have no occasion to consider whether such a rule would be consistent with section 198 as interpreted in *Trevino* or other cases." (*Nguyen, supra*, 61 Cal.4th at p. 1046.)

Defendant insists *Trevino* was wrongly decided. However, given the Supreme Court's reference to *Trevino* in *Nguyen* and its discussion of the applicability of section 198 to section 197, subdivision (1), we decline to deviate from prior precedent. Defendant argues in the alternative that he is making the argument the defendant in Nguyen did not make. Not so. Here, defendant claims the "fear alone" requirement of

10

self-defense has no application to certain types of self-defense based on the text of sections 197 and 198. In contrast, the Supreme Court in *Nguyen* noted the possibility that acting based on mixed motives may be permissible if fear was the cause-in-fact for the decision to kill. In any event, on this record there is no basis to conclude that the challenged instruction was erroneous.

Because there was no instructional error, defendant's substantial rights were not affected by providing the instruction.

## III

Defendant further claims the trial court prejudicially erred in imposing the upper term based on aggravating circumstances not proven in accordance with section 1170, subdivision (b). The People agree this was error and that the error prejudiced defendant.

Section 1170, subdivision (b)(2) provides that, in selecting a term of imprisonment, a trial court "may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term and the facts underlying those circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." Notwithstanding this rule, a "court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (§ 1170, subd. (b)(3).)

"[W]ith the exception of prior conviction allegations, 'under the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence must be found by a jury' and 'established beyond a reasonable doubt.' " (*People v. Lynch* (2024) 16 Cal.5th 730, 747 (*Lynch*); see *Cunningham v. California* (2007) 549 U.S. 270, 281.) In *Lynch*, the California Supreme Court explained that, under section 1170, subdivision (b), "a Sixth Amendment violation occurs when the trial court relies on

11

unproven aggravating facts to impose an upper term sentence, even if some other aggravating facts relied on have been properly established." (*Lynch,* at p. 768.)

Further, in *Erlinger v. United States* (2024) 602 U.S. 821, the United States Supreme Court rejected the argument that the prior conviction exception to the Sixth Amendment "permits a judge to find perhaps any fact related to a defendant's past offenses." (*Id*. at p. 837.) Rather, "a judge may 'do no more, consistent with the Sixth Amendment, than determine what crime, with what elements, the defendant was convicted of.' " (*Id.* at p. 838.)

Here, the trial court imposed the upper term based on three aggravating circumstances. The aggravating circumstances were not proven in accordance with section 1170, subdivision (b)(2) and the prior conviction exception would not apply to them. (See *People v. Wiley* (2025) 17 Cal.5th 1069, 1083-1084 (*Wiley*) ["We understand *Erlinger* to require that any fact, beyond the bare fact of a prior conviction, that exposes a defendant to harsher punishment, must be found by a jury beyond a reasonable doubt"].)

A trial court's reliance on aggravating circumstances not found in accordance with section 1170, subdivision (b) is "prejudicial unless an appellate court can conclude beyond a reasonable doubt that a jury would have found true all of the aggravating facts relied upon by the trial court to justify an upper term sentence, or that those facts were otherwise proved true in compliance with the current statutory requirements. If the reviewing court cannot so determine, applying the *Chapman* [*v. California* (1967) 386 U.S. 18] standard of review, the defendant is entitled to a remand for resentencing." (*Lynch, supra*, 16 Cal.5th at p. 768.) When assessing prejudice under *Chapman*, the proper inquiry is " 'whether any rational fact finder could have come to the *opposite* conclusion.' " (*Wiley, supra*, 17 Cal.5th at p. 1090.) If a rational juror could have reached the opposite conclusion, the error is not harmless under *Chapman*. (*Ibid*.) The People bear the burden of establishing that the federal constitutional error was harmless beyond a reasonable doubt. (*People v. Avalos* (2022) 85 Cal.App.5th 926, 953.)

12

We agree with the parties that the error was not harmless under the rigorous *Chapman* standard. The California Supreme Court has cautioned against attempting to determine whether a jury would have found true aggravating circumstances that require " ' "an imprecise quantitative or comparative evaluation of the facts." ' " (*Lynch, supra*, 16 Cal.5th at pp. 775-776.) " 'The reviewing court cannot assume that the record reflects all of the evidence that would have been presented to the jury, or that the defendant had the same incentive and opportunity at a sentencing hearing to contest the aggravating circumstance. . . . "[T]o the extent a potential aggravating circumstance . . . rests on a somewhat vague or subjective standard, it may be difficult for a reviewing court to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court." ' " (*Id.* at p. 775.) Bearing this guidance in mind, we decline to conclude, beyond a reasonable doubt, that a jury would have found true all the aggravating circumstances relied upon by the trial court to impose the upper term. (Cf. *Wiley, supra*, 17 Cal.5th at p. 1090 [deciding it could not "conclude beyond a reasonable doubt that a properly instructed jury would have found [the defendant's] criminal convictions were of increasing seriousness"].)

Because the trial court's reliance on the improperly found aggravating circumstances was not harmless beyond a reasonable doubt, we will vacate defendant's sentence and remand the matter. "Further proceedings on remand are to be conducted in accordance with the current statutory requirements and the defendant given the opportunity for the jury trial, of which he was deprived." (*Lynch, supra*, 16 Cal.5th at p. 777.) "On remand, the parties remain free to introduce at trial all relevant evidence to support or contest the factual support for the aggravating circumstances set out in the California Rules of Court. The court may rely on any properly proven aggravating facts, including prior convictions or facts necessarily found by the jury to support a verdict on underlying counts and enhancements. The court retains its discretion to impose an upper term sentence if it concludes that one or more properly proved circumstances justify such

13

a sentence.  (§ 1170[, subd. ](b)(2).)  If it cannot so conclude, it may impose no more than a middle term."  (*Id.* at pp. 777-778.)

DISPOSITION

Defendant's sentence is vacated, and the matter is remanded to the trial court for further litigation of the aggravating circumstances and for resentencing.

/S/
MAURO, Acting P. J.

We concur:

/S/
BOULWARE EURIE, J.

/S/
FEINBERG, J.