Filed 9/19/23

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANTHONY EDWARD MORONES, JR.,<br><br>    Defendant and Appellant. | C095560<br><br>(Super. Ct. No. STK-CR-FDV-2020-0009636) |

APPEAL from a judgment of the Superior Court of San Joaquin County, Lance G. Jacot, Judge. Reversed in part and affirmed in part.

Jake Stebner, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Kimberley A. Donohue, Deputy Attorneys General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II and III of the Discussion.

1

While his two teenaged children were across the hall, defendant Anthony Edward Morones, Jr., fired a gun outside a bathroom window. After he was arrested and a complaint was filed against him, he attempted to persuade his children to lie to law enforcement about the incident. A jury found defendant guilty of grossly negligent discharge of a firearm, two counts of misdemeanor child endangerment, felon in possession of a weapon, and two counts of dissuading a witness.

On appeal, defendant contends that his witness dissuasion convictions under Penal Code section 136.1[1] should be reversed asserting, in part, the statute only applies to efforts to dissuade a witness prior to charges being filed. He also contends that the trial court erred when it failed to properly instruct the jury on elements of the offenses and consider section 654 in sentencing. We will reverse two of defendant's convictions for witness dissuasion and otherwise affirm the judgment.

## FACTUAL AND LEGAL BACKGROUND

In August 2020, defendant's 16-year-old son Anthony and 14-year-old daughter Inez got into an argument. Angry, Anthony went to his bedroom and threw one of his shoes at a wall.[2]

Defendant, who had been in the bathroom across the hall from the bedrooms, came out and yelled at the teenagers to stop fighting before he returned to the bathroom. No one else was home.

---

[1]    Undesignated statutory references are to the Penal Code.

[2]    Anthony died prior to trial and the parties agreed he was unavailable for purposes of Evidence Code section 1291. At trial, the jury heard his preliminary hearing testimony.

A short time later, Inez and Anthony heard gunshots in the bathroom. Inez saw defendant leave the bathroom with a gun.[3] Anthony told defendant to leave the house.

Timothy Gaea, a teacher at the elementary school across the street from defendant's house, was in his classroom with the principal when he heard two gunshots. About a minute later, he saw an adult male walk out of the house with Anthony at the door, "shooing" him out. The adult male pointed a gun at Gaea before walking away. The school principal called out to Anthony and Inez to inquire if they were okay.

Anthony and Inez called their maternal grandparents, Rachel and Pedro Gonzales, who picked them up from the house.[4]

Officer Kaela Ledford was called to the home. When she arrived, no one was there. Officer Ledford contacted Rachel Gonzales—the reporting party—by phone and eventually interviewed her, Anthony, and Inez at the house. Officer Ledford found three shell casings outside and below the bathroom window, with no dirt, weathering, or oxidization, which indicated to Officer Ledford they were recently expelled from a firearm. There was a hole in the eave above the bathroom window with fresh splintering. A screen to the bathroom window had a large rip in it.

That night, Rachel Gonzales returned to the house with Inez and Anthony. She saw defendant was there and called the police. Officers arrived and arrested defendant.

While in jail awaiting his preliminary hearing, defendant spoke with Anthony and Inez by phone multiple times, despite the existence of a protective order not to have contact with them while in jail.

---

[3] At trial, Inez first testified that her preliminary hearing testimony that she saw defendant with a gun was truthful, but later stated it was untruthful and she did not see defendant with a gun that day.

[4] Anthony testified that he walked to his auntie's house after the shooting, and that his godsister later picked him up. Eventually, she dropped him off at the house. His grandparents and Inez were there.

On September 1, 2020, the prosecutor charged defendant with grossly negligent discharge of a firearm (§ 246.3, subd. (a)) (count 1), and two counts of felony child endangerment (§ 273a, subd. (a)) (counts 2 [as to Anthony] & 3 [as to Inez]). In March 2021, the prosecutor filed an amended information adding one count of felon in possession of a firearm (§ 29800, subd. (a)(1)) (count 4), one count of attempting by threat or force to dissuade a witness from reporting a crime (§ 136.1, subd. (c)(1)) (count 5 [as to Anthony]), and one count of attempting to dissuade a witness from reporting a crime (§ 136.1, subd. (b)(1)) (count 6 [as to Inez]). As to each count, the prosecution alleged that defendant had suffered three prior serious or violent felony convictions (§ 1170.12, subd. (b)).

A jury found defendant guilty as charged on counts 1, 4, 5, and 6, and guilty of the lesser included offense of misdemeanor child endangerment on counts 2 and 3.

Defendant filed a motion for a new trial arguing, in part, that the People failed to prove beyond a reasonable doubt that he dissuaded a witness from testifying at a preliminary hearing or trial. He argued that the evidence only showed that he asked the children to change their account of the incident. The trial court denied the motion, finding "there was sufficient evidence to justify the jury's verdict. There was numerous instances that they could have hung their hat on. We heard the recordings from [defendant] from the jail to his two children."

On January 3, 2022, the trial court found all prior conviction allegations true. The same day the court sentenced defendant to an aggregate third-strike sentence of 25 years to life, consisting of concurrent sentences of 25 years to life on counts 1, 5, and 6, a concurrent two years on count 4, and a concurrent 364 days each on counts 2 and 3.

Defendant filed a timely notice of appeal.

4

I

*Dissuading Witnesses*

Defendant argues that as a matter of law, the evidence cannot sustain his convictions for preventing or dissuading a report to law enforcement pursuant to section 136.1, subdivision (b)(1) because, in part, the children had already reported his criminal conduct to law enforcement prior to the jail calls in which he suggested they lie to law enforcement. He claims that, at best, defendant may have induced his children to give false—or to withhold—material information, a misdemeanor pursuant to section 137. He contends both his convictions for dissuading a witness must be reversed. In response, the People contend: (1) there was sufficient evidence to convict defendant under section 136.1, subdivision (a)(2) *or* (b)(1); (2) the issue is one of instructional error rather than a question of sufficiency of the evidence; (3) giving the wrong version of the instruction on witness intimidation was harmless error; and (4) if the error is reversible, retrial is not barred by double jeopardy considerations. We agree with defendant and conclude his convictions for dissuading a witness in counts 5 and 6 must be reversed.[5]

*A. Additional Background*

1. Calls with Inez

On September 22, 2020, at 12:27 p.m., after his arrest and formal charges having been filed against him, defendant and Inez spoke by phone. During that call, the following exchange took place:

Defendant: "I mean, you know what I'm saying, I didn't even have a gun like, . . . did you see me with a gun shooting? Did you see me shoot a gun?

"[Inez]: Nah.

---

[5]    In light of this conclusion, we need not consider the People's remaining claims or defendant's claim of instructional error as it pertains to counts 5 and 6.

"[Defendant]: Well, then what the fuck would you say that for? Hey, how'd your Jordans go?

"[Inez]: I didn't say . . . ."

On September 29, 2020, defendant and Inez spoke by phone again. After defendant asked her to go somewhere where nobody could hear her, the following conversation took place.

Defendant: "What'd you tell the cops?

"[Inez]: I just told 'em that - well, I just told 'em that you were just in the bathroom and you just shot the gun. I didn't tell them that you had a gun. They just must have heard me wrong because I told 'em that you didn't have a gun.

"[Defendant]: Hey, and you said I was in the bathroom and I shot it?

"[Inez]: Yeah.

"[Defendant]: And you told 'em - uh, did you see me?

"[Inez]: No. [¶] . . . [¶]

"[Defendant]: So what's up? Mom [sic], you never seen me shoot a gun, man. Can you ma- when they come through, can you - can you swap it out for me and just be like - be like I don't know, many, you guys - you guys c- you gotta make up a big ass story that it was a lie please.

"[Inez]: Yeah, dad, I'll do that.

"[Defendant]: Are you or what, man? Are you with me? Do you want me to be here forever?

"[Inez]: Yes, I'm with you. You're my fucking best friend, man. [¶] . . . [¶]

"[Defendant]: Hey, no, for real, look, um, they gonna have - they gonna have somebody come and talk to you again.

"[Inez]: What the hell? For what?

"[Defendant]: To try to get the - just to get your story again and shit like that and then they're gonna try to make it - they're - they're trying - you're the only one - you're the only reason why, fool, that - um, see they got head phones too.

"[Inez]: Mm-hm. [¶] . . . [¶]

"[Defendant]: But all I need is for you guys to do is just be like I don't know - I don't know if - if one of you guys said, like, you guys seen me with a - you didn't tell the cops you seen me with a gun?

"[Inez]: No.

"[Defendant]: Did Anthony maybe tell 'em that you guys seen me with a gun the day before or the - nothing like that?

"[Inez]: No."

Inez testified that she understood defendant requested that she lie by telling law enforcement that he did not have a gun.

2. Calls with Anthony

On September 22, 2020, defendant spoke with Anthony by phone:

Defendant: "I - I know - I know but, uh, I can't understand why - what - what happened. Can you tell me what h- what'd you guys tell - what'd you tell - what'd you tell the people?

"[Anthony]: When you shot off the gun and then left, everybody came over here, like, the school, the teachers, principals, everybody and then my grandma . . . . [¶] . . . [¶]

"[Defendant]: But you want me to go away forever?

"[Anthony]: No, I'm gonna drop all them charges when I go to your court. I'm gonna tell 'em how everything was a lie but . . .

"[Defendant]: Yeah.

"[Anthony]: . . . whatever Inez tells them, that's Inez though. I - I'm gonna drop all my charges with you, Pop. Man, I - I didn't - I didn't want you to stay in there - I

don't want you to stay in there for that long.  I just want you to stay in there so you can get your mind right so you can get right . . .

"[Defendant]:  Yeah.

"[Anthony]:  . . . and you come out right, man.  I don't want you to be like this no more.  [¶] . . . [¶]

"[Defendant]:  I mean, I know - I know - uh, I don't know, did you tell guns - did you tell the cops you seen me with a gun?

"[Anthony]:  No, I didn't tell 'em none of that.  I just told them you just was in the bathroom and I threw something at the wall and then you came out tripping and then you went back in there and, like, not even, like, 60 minutes to - 60 seconds to a minute you shot off the gun.  And they was like, 'How many times?'  And I was like, 'Three or four times.'  That's it.  And then lady kept on trying to ask me, asking me, asking me and I was like, 'Man, I don't wanna talk to you guys no more.  I said what I said.  I'm done.'  And then she started talking to Inez and Inez told her whatever - whatever she had to say to them.  [¶] . . . [¶]

"[Defendant]:  I know - no, but check it out - but you guys never seen me actually pull a gun out and shooting - shoot it fool, like, you – 'cause you thought I was in the bathroom, you thought it was me, you feel me, like so – so, like, you can't really physically say you seen me with a gun shooting it, you know what I'm saying?

"[Anthony]:  Yeah

"[Defendant]:  And that's facts.  Nigga, that's facts.  And I'm not trying to - I'm not trying to say nothing but, nigga, I was in the bathroom dad [*sic*], you know what I'm saying, d- you didn't even see me shoot, you didn't see me with a gun, you feel me?  I don't own a gun.

"[Anthony]:  Yeah.  [¶] . . . [¶]

"[Defendant]:  . . . it's - it's - it's all upon you, you feel me?  But it's just - it's just - it's just a fucked-up situation but do know I love you, nigga, and just keep - keep that in

mind though.  You never seen me with a gun, my nigga.  You never seen me shoot that. You know what I'm saying, you - you could say I was in the bathroom, you heard shots, and, yeah, I did it but you never seen me with your eyes me pull out a gun and shoot.  Did you?

"[Anthony]:  Yeah.  No.

"[Defendant]:  All right."

On September 29, 2020, defendant spoke with Anthony at 7:04 p.m.  During that call, defendant told Anthony, "No, just be like - just be like - be like, man, my dad's on drugs and ev- everything I made up was - uh, everything I told you was a fucking lie, you feel me?"  Defendant told Anthony what he expected the investigators to say when Anthony changed his story and that they might tell Anthony he could go to jail for lying. When Anthony confirmed he planned to deny his previous statements, defendant told Anthony to keep telling investigators that his dad was on drugs, "but that's all you gotta keep telling them 'cause they ain't your friends, my nigga."  Later, defendant said to Anthony, "all you gotta keep saying is, man, I don't know, I lied.  I said that . . . because my dad was on drugs, that's it, you feel me?"  Anthony responded, "Yeah."

Later in the call, defendant asked Anthony "what you gonna tell them niggas when they come questioning you?"  Anthony responded:

Anthony:  "Mm, when they come talk to me, I'm gonna tell 'em what you told me. I'm just gonna be like he needs help.  That's it.  That's all I'm gonna say.  I ain't gonna have nothing else to say.  (Unintelligible).  [¶] . . .[¶]

"[Defendant]:  Yeah, but what'd I do?  I didn't even do nothing though.  What are you talking about I did what I did?

"[Anthony]:  I'm not saying like that.  I'm just saying, like, man, I said what I said and, like, if . . .

"[Defendant]:  Yeah, but l- but listen, you gotta - you gotta choose - you gotta choose your words wisely though because . . .

9

"[Anthony]:  Yeah.  [¶] . . . [¶]

"[Defendant]:  . . . you told 'em - you told 'em I had a hammer, my nigga.  You told 'em I had a gun and I banged it.

"[Anthony]:  Yeah.

"[Defendant]:  For what reason I have - no reason to understand.  I mean, I don't know if you seen me with a gun (unintelligible), you feel me, but that's what you told 'em and that's what's fucking gonna get me banged out.

"[Anthony]:  Yeah.

"[Defendant]:  So, like, even too - like, with Inez too, the same shit, you feel me? [¶] . . . [¶]

"[Defendant]:  And they're gonna say did your dad call you and tell you to say this shit and what are you gonna say?

"[Anthony]:  I'm gonna be like hell no, hell no and I never - haven't talked to him ever since he got locked up, I never talked to him or anything.

"[Defendant]:  That's what you say.  But you gotta - you gotta really tell 'em like, man, I - I - I said that shit, I mean, man, he didn't do it.  Just say that.  You gotta be like, man, he didn't do that shit just straight the fuck up.

"[Anthony]:  All right, Pop, I got you."

The two spoke again later that same day, at 8:17 p.m.:

Defendant:  "Aye and uh fuck it.  Make sure you tell these niggas man- you lying.  Man make sure you tell them you lied.  Just keep telling them that.  'I fucking lied.'  You got to keep telling them 'I fucking lied' man 'I fucking lied' nigga damn.  Everything I said I should've fucking lied.  You gotta keep telling them dad [*sic*].

"[Anthony]:  Alright I will pop, I love you man.

"[Defendant]:  And - and you gotta say like man like maybe he got shot at or something.  Fuck.  I don't know.  You gotta say some shit.  Something nigga.  Fuck.  Something man.  Got damn.

10

"[Anthony]: I love you man."

On October 4, 2020, defendant spoke with Anthony again. Anthony protested that Sonny is "getting at me the wrong way. He's over here texting at me and shit like, or someth-- I'm supposed to be scared of him or something." He also said that Sonny "was just getting at me all sideways. I wasn't liking that."

Anthony testified that defendant never threatened him to not testify and he did not know anyone named Sonny.

### 3. Calls with Third Parties

On September 10, 2020, defendant spoke on the phone to an unidentified female. They spoke about statements made by defendant's family members and how people in jail do not like snitches.

On October 3, 2020, the day before defendant and Anthony spoke about Sonny, defendant spoke with Sonny by phone. Defendant asked if he had talked to Anthony recently, and Sonny said, "Nah." Defendant then said,

Defendant: "Man, whenever you get the chance fly by there and push up on Nez and them.

"[Sonny]: All right, I will, I'll do that shit today.

"[Defendant]: Hey, and just tell 'em, like, hey, y'all niggas need to be like - y'all niggas need to be like I don't remember saying none of that. Like, just play dumb. You know what I mean?

"[Sonny]: I know, Imma do that shit today fa sho'. I got you."

### 4. Jury Instructions and Closing Argument

As previously noted, the amended information charged defendant in counts 5 and 6 with violating section 136.1, alleging that defendant attempted to prevent Anthony and Inez from "making a report of such victimization" to law enforcement officers. With respect to Anthony, the prosecutor alleged that defendant's attempt at such action was through force or the threat of force pursuant to subdivision (c)(1).

11

During a conference on the jury instructions, the prosecutor requested the court to instruct the jury with CALCRIM No. 2622, including alternative 1C. As provided in the pattern instruction, alternative 1C would have instructed the jury that the People must prove, in part, that defendant tried to prevent or discourage Anthony and Inez from cooperating or providing information so that a complaint or information could be sought and prosecuted, and from helping to prosecute that action. (CALCRIM No. 2622.) The trial court agreed to include alternative 1C.

During closing argument, the prosecutor characterized defendant as "constantly telling these children to lie for him" and provided examples of this from the conversations. The prosecutor argued, "Also, you have to ask yourselves, why would he ask them to lie for him? Why does he have to ask them to lie for him? Why? Because he did it and he had a gun and he shot it. That's why he's asking them to lie for him. [¶] And this is obstructing justice. This is obstructing the criminal justice system. This is asking, you know, a 14-year-old and a 16-year-old to come in here and make it up, change the story, swap it out, tell them something else so that I can get away with it."

Despite the trial court's agreement to instruct the jury with alternative 1C, the court instead instructed the jury with alternative 1A as follows: "To prove that the defendant is guilty of this crime the People must prove that, one, the defendant maliciously tried to prevent or discourage Anthony . . . and Inez . . . from giving testimony at a preliminary hearing or jury trial; two, Anthony . . . and Inez . . . were a witness or a crime victim; and, three, the defendant knew he was trying to prevent or discourage Anthony . . . and Inez . . . from giving testimony at a preliminary hearing or a jury trial. [¶] A person acts maliciously when he or she unlawfully intends to annoy, harm, or injure someone else in any way or intends to interfere in any way with the orderly administration of justice. . . ." Neither party objected to the instruction.

The verdict form for count 5 (regarding Anthony) states that the jury found defendant guilty of violating section 136.1, subdivision (c)(1), "as set forth in Count 5 of

the Information." The verdict form for count 6 (regarding Inez) states that the jury found defendant guilty of subdivision (b)(1) of section 136.1, "as set forth in Count 6 of the Information."

*B. Analysis*

Section 136.1 prohibits multiple versions of the crime of dissuading a witness. (See *People v. Torres* (2011) 198 Cal.App.4th 1131, 1137 [finding § 136.1 "defines a family of 20 related offenses"].) Subdivisions (a) and (b) of section 136.1 define the basic crime, and subdivision (c) defines an aggravated form of the crime committed knowingly and maliciously under certain circumstances. Because subdivision (c) is the aggregated version of the commission of the offense under subdivision (a) or (b), we will focus on the two latter subdivisions. As relevant here, subdivision (a)(2) involves preventing witnesses or victims from testifying in court and requires proof that the defendant "[k]nowingly and maliciously attempt[ed] to prevent or dissuade any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law." (§ 136.1, subd. (a)(2).)

Section 136.1, subdivision (b)(1) involves preventing a witness or victim from reporting a crime to police. (§ 136.1, subd. (b)(1).) It requires proof that the defendant "attempt[ed] to prevent or dissuade another person who has been the victim of a crime or who is witness to a crime" from "[m]aking any report of that victimization to any peace officer or state or local law enforcement officer or probation or parole or correctional officer or prosecuting agency or to any judge." (§ 136.1, subd. (b)(1).) Unlike a violation of subdivision (a), a violation of subdivision (b)(1) of section 136.1 " 'does not require that the defendant act knowingly and maliciously.' " (*People v. Cook* (2021) 59 Cal.App.5th 586, 590.)

In this case, it is undisputed that while the information alleged defendant violated section 136.1, subdivision (b)(1) (as it relates to Inez) and (c)(1) (as it relates to Anthony) by dissuading a witness and/or victim "from making a report of such victimization," the

13

jury was only instructed on the elements of section 136.1, subdivision (a): that defendant attempted to prevent or discourage Anthony and Inez from giving testimony at a preliminary hearing or jury trial. (See CALCRIM No. 2622, Alternative 1B and 1A, respectively.) To further complicate matters, the theory advanced by the prosecution to support these counts during closing argument was that defendant tried to dissuade the witnesses when he encouraged his children to lie.[6]

The People contend that, because the jury was instructed on considering the evidence under subdivision (a)(2), we must presume that the jury found him guilty of violating that subdivision. However, "A verdict should be read in light of the charging instrument and the plea entered by the defendant. [Citations.] . . . '[I]n connection with the information, they cannot be understood otherwise than as referring to the defendant and to the crime named in the information or indictment.' [Citation.] . . . [T]he form of the verdict generally is immaterial, so long as the intention of the jury to convict clearly may be seen. [Citations.]" (*People v. Paul* (1998) 18 Cal.4th 698, 706-707; but see *People v. Jones* (1997) 58 Cal.App.4th 693, 710 [" ' "A verdict is to be given a reasonable intendment and be construed in light of the issues submitted to the jury and the instructions of the court" ' "].)

---

[6] Defendant argues the argument correctly characterizes his behavior, which is aligned with section 137, which, in relevant part, provides: "(c) Every person who knowingly induces another person to give false testimony or withhold true testimony not privileged by law or to give false material information pertaining to a crime to, or to withhold true material information pertaining to a crime from, a law enforcement official is guilty of a misdemeanor." (§ 137, subd. (c); cf. Judicial Council of Cal., Crim. Jury Instns. (2023) Related Issues to CALCRIM No. 2622, p. 511 ["Because one cannot 'influence' the testimony of a witness if the witness does not testify, a conviction under Penal Code section 137(b) is inconsistent with a conviction under Penal Code section 136.1 or 138, which requires that a defendant prevent, rather than influence, testimony. (*People v. Womack* [(1995)] 40 Cal.App.4th [926,] 931)"].)

The People also argue that the evidence supports a conviction under either subdivision (a)(2) or (b)(1). We conclude the facts are insufficient to support a conviction under either subdivision. (See *People v. Hallock* (1989) 208 Cal.App.3d 595, 607 [where defendant was charged pursuant to sub. (b) but the jury was instructed on a violation of subd. (a) of § 136.1, the court examined the sufficiency of the evidence as to either charge].)

Defendant argues subdivision (b)(1) only applies to initial reports and once a defendant is arrested and charged based on that report, he cannot be subject to criminal liability for subsequent attempts to influence supplemental reports to law enforcement. He argues we should follow the reasoning in *People v. Reynoza* (2022) 75 Cal.App.5th 181, review granted May 11, 2022, S273797, which recently examined section 136.1, subdivision (b)(2). That subdivision requires proof that the defendant attempted to prevent or dissuade another person from causing a complaint, indictment, information, probation or parole violation to be filed. (§ 136.1, subd. (b)(2).) The *Reynoza* court held that "[i]f the defendant was aware the relevant charging document had already been filed, and the defendant did not attempt to prevent or dissuade the filing of any amended or subsequent charging document, the defendant has not violated section 136.1[, subdivision ](b)(2)." (*Reynoza*, at p. 189.)

The People disagree and, citing to *People v. Pettie* (2017) 16 Cal.App.5th 23, 54-55, argue the statute prohibits dissuasion of *any* report, including future or postarrest supplemental reports. The People argue that the evidence is sufficient to support a conviction under subdivision (a)(2) *or* (b)(1) because defendant's actions conveyed the dual attempt to prevent a report and future testimony. We must therefore determine whether defendant's conduct of encouraging his children to lie to law enforcement constituted either of these offenses.

The issue is one of statutory construction. As such, "our fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We

15

begin by examining the statute's words, giving them a plain and commonsense meaning. [Citation.]  We do not, however, consider the statutory language 'in isolation.' [Citation.] Rather, we look to 'the entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . .  [Citation.]' [Citation.]  That is, we construe the words in question ' "in context, keeping in mind the nature and obvious purpose of the statute . . . ." [Citation.]' " (*People v. Murphy* (2001) 25 Cal.4th 136, 142.)  We review issues of statutory construction de novo.  (*People v. Gonzales* (2018) 6 Cal.5th 44, 49.)

We agree with the court in *People v. Fernandez* (2003) 106 Cal.App.4th 943 (*Fernandez*) that common usage of the word " 'report' " does not support the People's position that " 'report' " necessarily includes " 'testimony.' " (*Id.* at p. 948.) " '[R]eport' " means " 'an account presented' " (see *ibid.*, citing American Heritage Dict. (3d college ed.) p. 1158), either written or spoken, while " '[t]estimony,' on the other hand, is more specifically defined as a 'declaration by a witness under oath, as that given before a court.' " (*Fernandez*, at p. 948, citing American Heritage Dict. (3d college ed.) p. 1401.)  "Victimization" means "[t]o make a victim of."  (American Heritage Dict. Online (2023) < https://ahdictionary.com/word/search.html?q=victimization> [as of Sept. 18, 2023], archived at: <https://perma.cc/2HYU-KJ9H>.)  Accordingly, making a report of victimization under subdivision (b)(1), means notifying the authorities that the crime has occurred and providing the account of the event which made someone a victim. (See *Fernandez*, at p. 948 [in the context of reporting a crime, a report "generally means notifying the authorities that the crime has occurred and providing information about the offense"].)  This would apply each time the one making the report is victimized or witnesses a crime.

Contrary to defendant's claim, the statutory language does not support the conclusion that subdivision (b)(1) only applies to prohibited conduct that takes place before a witness or victim makes an initial report.  We distinguish *Reynoza* on the basis that, unlike subdivision (b)(2) as charged in that case, subdivision (b)(1) contains no

specificity with respect to the timing of the report vis-à-vis the initiation of criminal prosecution. With respect to subdivision (b)(1), which prohibits attempts to dissuade a victim and/or witness from making any report of that victimization to law enforcement or any judge, one may easily envision scenarios where a complaining witness reports an initial victimization, and subsequently reports a new victimization that occurred after the first victimization, either pre- or postarrest. For example, each violation of a court order would warrant a report of victimization, regardless of whether defendant had already been arrested or charged after the first violation. (Cf. *People v. Pettie, supra*, 16 Cal.App.5th at pp. 54-55 [§ 136.1, subd. (b)(1) was satisfied where the defendants attacked the victim after the victim made a police report under circumstances making it clear the attack was an attempt to prevent any future report to the police].) But, contrary to the People's claim, the plain language of section 136.1, subdivision (b)(1) does not support the conclusion that this section pertains to any supplemental or followup report in which details already reported are simply confirmed or reviewed. Remembering or confirming a detail of how the victimization was accomplished is not a report of the victimization itself.

According to the People, defendant's conduct satisfies subdivision (b)(1) where Anthony and Inez had yet to report seeing defendant with a gun and defendant's comments were meant to prevent reporting of that victimization. We disagree for two reasons. First, the record demonstrates that the victimization was defendant's act of firing a gun while the children were in the house; whether the two children saw him with a gun was a detail of that victimization and would not satisfy a separate report under subdivision (b)(1). Second, contrary to the People's claim, that detail had already been addressed in the initial report of victimization.

Anthony and Inez reported they heard gunshots coming from the bathroom where defendant was located. Shell casings that appeared to be freshly ejected from a firearm were found outside the bathroom window. A hole in the eave with fresh splintering was

discovered above the bathroom window. Thus, the sound of gunshots along with the physical evidence gave rise to a strong inference that defendant possessed and fired a gun that day, as reported by Anthony and Inez. Indeed, in Inez's initial report to law enforcement, she specifically stated that she saw defendant come out of the bathroom with a gun. Anthony consistently said he did not see defendant with a gun, and there is no evidence to suggest this was not true. Because it appears that at the time of the phone calls between defendant and his children there was no new information of criminality to report as to the victimization, we conclude that defendant's actions do not constitute dissuading a witness under subdivision (b)(1).

The People assert, in the alternative, that the facts support a conviction for subdivision (a)(2) when defendant attempted to dissuade Anthony and Inez from testifying at the preliminary hearing or trial. In making this argument, the People equate defendant's act of urging the children to refrain from reporting they saw defendant with the gun with dissuading testimony because a witness's testimony is a formal type of report. Again, we disagree.

While a violation of subdivision (b)(1) could, in theory, include an initial report of victimization given during testimony, that is not the situation with which we are faced. The conversations between defendant and Anthony and Inez do not support a conclusion that defendant attempted to dissuade their testimony. Rather, their conversations evince defendant's attempts to get Anthony and Inez to lie when speaking to law enforcement. We therefore agree with defendant and conclude that his actions did not constitute an attempt to prevent testimony in violation of subdivision (a).

Defendant maintains the prosecutor's closing argument, in which she highlighted portions of the jail calls and characterized them as proof that defendant was encouraging his children to lie, was consistent with the evidence, but not with the charges. Citing to *People v. Womack, supra*, 40 Cal.App.4th 926 (*Womack*) and *Fernandez, supra*, 106 Cal.App.4th 943, defendant claims that where, as here, the evidence only establishes

18

that defendant sought to alter the future statements or testimony to his favor, his convictions for dissuading witnesses must be reversed. We agree.

"Section 136.1, subdivision (b)(1) is not a catch-all provision designed to punish efforts to improperly influence a witness." (*Fernandez, supra*, 106 Cal.App.4th at p. 948.) Rather, it is one part of a "detailed and comprehensive statutory scheme for penalizing the falsification of evidence and efforts to bribe, influence, intimidate or threaten witnesses." (*Ibid*.) To be sure, the state had the power to deter and punish conduct of the kind described here. (See generally *id.* at pp. 949-951 [analyzing the various statutory provisions prohibiting dissuasion]; § 137 [applying to attempts to influence testimony or information given to law enforcement].)

*Womack, supra*, 40 Cal.App.4th 926 is instructive. In that case, the defendant appealed from a judgment of conviction after a jury found him guilty of premeditated attempted murder and attempting to induce a witness to give false or withhold true testimony under section 137. (*Womack*, at p. 928.) The appellate court reversed his conviction for inducing a witness to give false testimony. The court concluded that section 137, which prohibits influencing testimony, cannot apply when the acts of testimony interference were committed in an attempt to kill the witness. The court stated, "an intent to kill the witness is not coextensive with an intent to influence the testimony of that witness . . . the two intents are mutually exclusive." (*Womack*, at p. 931.) The court reasoned that the "entire sense of . . . section 137 is that testimony will be given, but the perpetrator will attempt to *influence* the testimony given." (*Id.* at p. 930.) This is in contrast to sections 136.1 or 138, which prohibit attempts to dissuade testimony altogether. (*Womack*, at p. 931.) Here, too, defendant's actions demonstrate that in anticipating additional contact between law enforcement and his children, he attempted to influence their statements.

We conclude defendant's repeated and consistent attempts to get his children to lie to law enforcement regarding their victimization did not constitute a violation of section

19

136.1 subdivision (a)(2) or (b)(1) and we shall reverse defendant's convictions for counts 5 and 6.[7]

II

*Discharge of a Firearm*

Defendant argues that while instructing the jury on count 1—grossly negligent discharge of a firearm—the trial court erred by failing to include the elements of intent and gross negligence. He argues the issue is cognizable on appeal without raising it in the trial court because the instruction affected his substantial rights, and he was prejudiced by the error. The People argue: (1) the issue is forfeited; (2) the jury instructions as a whole were complete; and (3) any error was harmless. We conclude that the trial court erred in failing to instruct the jury on the element of intent but that the error was harmless.

An appellate court may review any instructional error even without an objection in the trial court if it "affected the substantial rights of the defendant." (§ 1259.) Our Supreme Court has considered instructional error that misled the jury or violated the due process clause to satisfy that standard. (*People v. Johnson* (2016) 62 Cal.4th 600, 638-639; *People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7.) Examining the merits of the claim is necessary to determine whether a claimed error affects a defendant's substantial rights. (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.) Claimed instructional error presents a legal question that we review de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "What is crucial for present purposes is the meaning that the instructions communicated to the jury. If that meaning was not objectionable, the

---

[7]     Because sections 136.1 and 137 are entirely distinct offenses, the prosecution's failure to charge defendant with a violation of section 137 precludes conviction. (*Fernandez, supra*, 106 Cal.App.4th at pp. 951-952; see also *Womack, supra*, 40 Cal.App.4th at p. 934.)

20

instructions cannot be deemed erroneous." (*People v. Benson* (1990) 52 Cal.3d 754, 801.)

The jury was instructed with CALCRIM No. 970, which sets forth the elements of grossly negligent discharge of a firearm, including the definition of gross negligence.[8] It was also instructed with CALCRIM No. 252—"Union of Act and Intent: General and Specific Intent Together," but only as to counts 2 through 6 (child endangerment, felon in possession of a firearm, and dissuading a witness). CALCRIM No. 252 instructed that the crimes and allegations charged require proof of the union, or joint operation, of act and wrongful intent. The instruction identified all charged offenses except count 1— grossly negligent discharge of a firearm—as either a general or specific intent crime and referred the jury to the instruction for the particular offense to explain the corresponding act, specific intent, or mental state.[9]

---

[8]    The relevant part of CALRIM No. 970, as given, provides: "The defendant is charged in Count 1 with shooting a firearm in a grossly negligent manner in violation of Penal Code section 246.3. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant intentionally shot a firearm; [¶] 2. The defendant did the shooting with gross negligence; [¶] AND [¶] 3. The shooting could have resulted in the injury or death of a person. [¶] *Gross negligence* involves more than ordinary carelessness, inattention, or mistake in judgment. A person acts with gross negligence when: [¶] 1. He or she acts in a reckless way that creates a high risk of death or great bodily injury. [¶] AND [¶] 2. A reasonable person would have known that acting in that way would create such a risk. [¶] In other words, a person acts with gross negligence when the way he or she acts is so different from the way an ordinarily careful person would act in the same situation that his or her act amounts to disregard for human life or indifference to the consequences of that act."

[9]    The instruction provided: "The crimes charged in Counts 2, 3, 4 requires proof of the union, or joint operation, of act and wrongful intent. [¶] The following crimes require general criminal intent: child abuse/endangerment, as charged in Count 2; child abuse/endangerment, as charged in Count 3; and felon in possession of a firearm, as charged in Count 4. For you to find a person guilty of these crimes, that person must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he or she intentionally does a prohibited act; however, it is not

21

Defendant claims the people were required to prove that defendant "actually knew the gun would fire in a grossly negligent manner at the time he pulled the trigger," and that the trial court erred in not instructing the jury that "it must find that, at the precise time when the act of discharging the fire[arm] was done, it was done knowingly and deliberately in a grossly negligent manner." We disagree on both points. The elements of grossly negligent discharge of a firearm under section 246.3 are: "(1) the defendant unlawfully discharged a firearm; (2) the defendant did so intentionally; (3) the defendant did so in a grossly negligent manner which could result in the injury or death of a person." (*People v. Alonzo* (1993) 13 Cal.App.4th 535, 538.) "[T]he statute's plain language requires proof that a defendant purposefully, willingly, or intentionally fired the weapon, with the added requirement that the firing occurred in a grossly negligent manner which could result in injury or death." (*In re Jerry R.* (1994) 29 Cal.App.4th 1432, 1439.) "The requirement that the discharge of a firearm be intentional is separate from the requirement that the discharge occur in a grossly negligent manner which could result in injury or death. [Citation.] Section 246.3 does not require a specific intent ' "to do a further act or achieve a future consequence" ' beyond the act of discharging a firearm in a grossly negligent manner. [Citation]." (*People v. Overman* (2005) 126 Cal.App.4th 1344, 1361.)

Defendant also contends the trial court erred in not giving CALCRIM No. 253 as relevant to the union of act and intent for count 1. As referenced above, the trial court did instruct the jury with CALCRIM No. 970, which includes the same language that

---

required that he or she intend to break the law. The act required is explained in the instruction for that crime. [¶] The following crimes require a specific intent or mental state: dissuading a witness by force or threat, as charged in Count 5 and dissuading a witness from reporting a crime, as charged in Count 6. For you to find a person guilty of these crimes, that person must not only intentionally commit the prohibited act, but must do so with a specific intent. The act and the specific intent and/or mental state required are explained in the instruction for that crime." (CALCRIM No. 252.)

CALCRIM No. 253 contains with respect to the definition of gross negligence. We therefore find no error as the elements of knowledge and gross negligence were adequately conveyed to the jury through CALCRIM No. 970.

The instructions are defective, however, in that grossly negligent shooting is not identified as a general intent crime in addition to requiring a mental state. (*People v. Ramirez* (2009) 45 Cal.4th 980, 990 [grossly negligent discharge of a firearm is a general intent crime requiring only willfully firing a gun].) The jury was not instructed, as it was for the other general intent offenses, that "it is not required that [defendant] intend to break the law" in order to commit grossly negligent discharge of a firearm. However, we find the omission is harmless beyond a reasonable doubt.[10] (*Chapman v. California, supra*, 386 U.S. at p. 24; see *People v. Schuller* (2023) 15 Cal.5th 237, 257 ["*Chapman* review applies not only to instructions that omit an element of the offense, but also to instructions that provide an incomplete or misleading description of what is necessary to establish an element of the offense"].) The definition of grossly negligent discharge of a firearm required the jury to find that "[t]he defendant intentionally shot a firearm." (CALCRIM No. 970.) This is essentially what must be conveyed for a general intent crime. "[G]eneral intent means that the 'person must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he or she *intentionally* does a prohibited act . . . .' [Citation.]" (*People v. Mitchell* (2012) 209 Cal.App.4th 1364, 1380-1381.) Because the essence of general intent was conveyed to the jury, separate instructions on the concurrence of act and intent required for grossly negligent discharge of a firearm would not have produced a verdict more favorable to

---

[10]    (See *People v. Hendrix* (2022) 13 Cal.5th 933, 944 [noting the dispute regarding the proper characterization of the instructional error for purposes of applying harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18 or *People v. Watson* (1956) 46 Cal.2d 818].)

defendant.  (See *People v. Benson, supra*, 52 Cal.3d at p. 801 [if the meaning of the instructions communicated to the jury was not  objectionable, the instructions cannot be deemed erroneous].)

*Sentencing*

Defendant argues that his concurrent sentences for negligent discharge of a firearm and child endangerment cannot stand because they are all based on the single act of discharging the firearm.  He argues the matter must be remanded to allow the trial court the opportunity to apply section 654.  The People argue that the multiple-victim exception to section 654 applies, rendering valid defendant's sentence on each count.

Though a person may be convicted of more than one crime for the same act, section 654 proscribes multiple punishments for the same act.  (§§ 654, 954; *People v. Correa* (2012) 54 Cal.4th 331, 337.)  The trial court must enter a stay rather than impose a concurrent sentence if section 654 prohibits multiple punishments.  (*People v. Jones* (2012) 54 Cal.4th 350, 353.)  Effective January 1, 2022, section 654, subdivision (a) provides in pertinent part that "[a]n act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."  (§ 654, subd. (a).)  An " 'act' " can include a " ' "course of conduct." ' "  (*Correa*, at p. 335.)  But a course of conduct causing multiple offenses is divisible—and subject to separate punishment—if the defendant entertained multiple objectives, independent of and not merely incidental to each other.  (*Correa*, at pp. 335-336; *People v. Liu* (1996) 46 Cal.App.4th 1119, 1135.)

"The question of whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination."  (*People v. DeVaughn* (2014) 227 Cal.App.4th 1092, 1113.)  "We uphold the trial court's ruling when substantial evidence supports it.  [Citation.]  This

standard of review is exceedingly deferential. [Citation.]" (*People v. Venegas* (2020) 44 Cal.App.5th 32, 38.)

Here, the parties agree defendant's convictions for negligent discharge of a firearm and child endangerment stemmed from the same act of discharging the firearm. Yet another exception exists allowing us to forego delving into divisibility or defendant's intent and objective. Multiple punishments are not proscribed if a defendant commits an act of violence by a means likely to cause harm to several persons. (*People v. Calles* (2012) 209 Cal.App.4th 1200, 1215-1216; see also *People v. Felix* (2009) 172 Cal.App.4th 1618, 1630-1631 ["There is a multiple victim exception to Penal Code section 654 which allows separate punishment for each crime of violence against a different victim, even though all crimes are part of an indivisible course of conduct with a single principal objective"].) To ensure that punishment will be commensurate with criminal liability, it has long been held that " 'the limitations of section 654 do not apply to crimes of violence against multiple victims.' " (*People v. Oates* (2004) 32 Cal.4th 1048, 1064, superseded by statute on other grounds as recognized in *People v. Tirado* (2022) 12 Cal.5th 688, 696, citing *People v. King* (1993) 5 Cal.4th 59, 78.) Specifically, " ' "[s]ection 654 is not 'applicable where . . . one act has two results, each of which is an act of violence against the person of a separate individual.' [Citations.]" [Citation.] . . .' [Citation.]" (*People v. Bragg* (2008) 161 Cal.App.4th 1385, 1403.)

Defendant contends the multiple-victim exception does not apply because it is not listed as a violent crime in section 667.5 and his conduct did not constitute a violent crime directed at any particular victim. We disagree. There is no requirement that the prosecution show that defendant intended harm to each victim by his wrongdoing. (*People v. Pantoja* (2004) 122 Cal.App.4th 1, 16.) Additionally, the fact that felony child endangerment is not listed in section 667.5 is not dispositive. "[W]hether a crime constitutes an act of violence that qualifies for the multiple-victim exception to section

654 depends upon whether the crime . . . is defined to proscribe an act of violence against the person." (*People v. Hall* (2000) 83 Cal.App.4th 1084, 1092.)

The crime of grossly negligent discharge of a firearm prohibits any person from willfully discharging a firearm in a grossly negligent manner which could result in injury or death. (§ 246.3.) Because this statute by definition entails the likelihood of great bodily injury or death, it qualifies as a violent crime for purposes of the multiple-victim exception. (See *People v. Hall, supra*, 83 Cal.App.4th at p. 1089 [a criminal act qualifies for the multiple-victim exception where the crime of which defendant was convicted was defined by statute to proscribe an act of violence committed " 'with the intent to harm' " or " 'by means likely to cause harm' " to a person], overruled on another ground in *People v. Correa, supra*, 54 Cal.4th at pp. 343-344.) Additionally, willful discharge of a firearm with gross negligence in violation of section 246.3 poses a sufficient danger to human life to constitute an act of violence because it presupposes that there are people in harm's way. (*People v. Clem* (2000) 78 Cal.App.4th 346, 351.) "It is universally accepted that a loaded gun is so dangerous an instrument that a high degree of caution and circumspection is required of the person handling it." (*People v. Tophia* (1959) 167 Cal.App.2d 39, 45, overruled on other grounds in *People v. Cox* (2000) 23 Cal.4th 665, 675.)

We also conclude that defendant's commission of child endangerment, based on the grossly negligent discharge of a firearm, was a violent crime for purposes of the multiple-victim exception to section 654. As a lesser included offense of felony child endangerment, the jury found defendant guilty of misdemeanor child endangerment after it was instructed as to section 273a, subdivision (b) as follows: (1) defendant willfully caused or permitted a child to suffer unjustifiable physical pain or mental suffering; and (2) defendant was criminally negligent when he caused or permitted the child to suffer. Violent crimes involve "physical force, sexual contact, physical injury or destruction of property, fear, coercion, or duress." (*In re Febbo* (2020) 52 Cal.App.5th 1088, 1102.)

26

Because the jury found defendant "willfully caused or permitted a child to suffer unjustifiable physical pain or mental suffering," we find this qualifies as a violent crime for the multiple-victims exception to section 654.

## DISPOSITION

Defendant's convictions on counts 5 and 6 are reversed, and the matter is remanded to the trial court for full resentencing on defendant's remaining convictions and sentencing enhancements. The trial court is directed to prepare an amended abstract of judgment reflecting defendant's new sentence and forward a certified copy to the Department of Corrections and Rehabilitation. The judgment is otherwise affirmed.

 

 

                                    /s/
                            EARL, P. J.

 

We concur:

 

/s/
HULL, J.

 

/s/
MESIWALA, J.

27