Filed 10/31/23  P. v. Gonzalez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D080153 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE400143) |
| JULIA GONZALEZ, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, Daniel G. Lamborn, Judge.  Affirmed.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, and Robin Urbanski and Juliet W. Park, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Julia Gonzalez of voluntary manslaughter (Pen. Code, § 192, subd. (a)) for, and found true the allegation that she personally used a

deadly and dangerous weapon in, killing Justyn Preston. The trial court sentenced her to a prison term of seven years.

Gonzalez raises two issues on appeal. First, she contends the trial court abused its discretion and prejudicially erred by excluding certain evidence of Justyn's prior acts of, and character trait for, violence. Second, Gonzalez argues the trial court prejudicially erred in giving allegedly misleading and incomplete jury instructions about the use of the admitted evidence of Justyn's prior violent acts.

We conclude the trial court did not err. The trial court appropriately exercised its discretion in allowing some evidence of Justyn's prior acts of violence but excluding the remainder under Evidence Code section 352. Further, the jury instructions properly instructed the jury on justified and voluntary manslaughter, including how to use the evidence of Justyn's prior violent acts. We accordingly affirm.

I.

A.

In May 2020, Gonzalez, her brother G.G., G.G.'s girlfriend, the girlfriend's mother, and a roommate lived in the front unit of a duplex in Lakeside, California. Justyn's two sisters and his mother lived in the back unit. The neighbors generally had a civil relationship. Justyn visited his family regularly but never interacted with Gonzalez or G.G. before May 7, 2020.

Gonzalez's friend K.H. dated Justyn in the past. K.H. had told Gonzalez they got into violent physical altercations and she had a restraining order against him.

B.

Gonzalez stabbed Justyn in the early morning hours of May 8, 2020.

2

Throughout May 7, 2020, Gonzalez, her friend J.C., G.G., and G.G.'s girlfriend hung out in a tent in the yard. In the evening, Justyn visited, and he and his sister T.P. had a bonfire and drank alcoholic beverages in a different part of the yard. At some point, Justyn drove his truck to the store with T.P. The tires squealed as Justyn drove up the driveway afterward, and Gonzalez said something to them about the noise. Justyn apologized, and he and T.P. returned to their bonfire.

Justyn and T.P. talked and drank for several hours. He said Gonzalez was "pretty." The siblings then reentered Justyn's truck to go back to the store. The windows were down and they were playing music as Justyn drove past the tent. Gonzalez yelled something, but Justyn and T.P. could not hear. Justyn asked T.P. who Gonzalez was, and T.P. said she thought Gonzalez's name was Julie or Julia. G.G. heard Justyn repeat Gonzalez's name in a "spooky," "soft and slow" tone. Gonzalez also heard a male voice call her name in a "creepy" way, so she left the tent.

Gonzalez got close to the truck and asked why they said her name, and T.P. said Justyn "'thinks you're pretty.'" Gonzalez recognized Justyn because she had seen his social media profile after K.H. told her about him. Gonzalez called him "weird" and walked away. Justyn drove the truck a bit and stopped.

Accounts diverge from this point. G.G. claimed T.P. threatened Gonzalez, while T.P. claimed Gonzalez and G.G.'s girlfriend were "yelling back and forth." Justyn remained in the truck. T.P. and Gonzalez approached each other and ended up fighting on the ground for several minutes, although T.P. and J.C. said Gonzalez was the aggressor and Gonzalez and her brother claimed T.P. was. T.P. hit Gonzalez in the face at least once.

3

G.G. ran toward the fight to break it up and told T.P. to "'[g]et off my sister.'" Justyn opened the truck door, got out, and approached the fight. G.G. tackled Justyn. G.G. said he was afraid of Justyn because of a "smirk" on his face and the way he spoke to Gonzalez. The men fell to the ground and fought each other while T.P. and Gonzalez continued fighting about eight feet away. G.G. put Justyn in a bear hug, and Justyn reached back and hit G.G. in the face and told him he was "going to fucking die." Justyn then put his hands around G.G.'s neck, and G.G. feared for his life. No one saw either with a weapon.

It is unclear when a tire iron entered the fight. Gonzalez testified that once T.P. let her go and she began to crawl toward Justyn and G.G.'s fight, T.P. hit her from behind with something hard. According to Gonzalez, T.P. stood with a tire iron by Justyn before Justyn was stabbed. T.P. testified that she "panicked" and grabbed the tire iron for protection only after she saw Justyn was bleeding.

At some point during the fighting, Gonzalez stabbed Justyn. According to Gonzalez, she heard Justyn tell G.G. several times he would "'kill [him].'" In fear of her brother's life, Gonzalez ran to the tent, grabbed a knife, and returned to the fight. She told Justyn she had a knife and told him to get off G.G., but he just looked at her and continued fighting G.G. Gonzalez told Justyn at least once to get off her brother; when he did not, she stabbed Justyn twice in his side and once in his lower back to save G.G. J.C. testified that Gonzalez walked toward the fighting men and said to "let go of her brother" three times before J.C. "saw what looked like [Gonzalez] punching [Justyn] in his side twice. But then the guy yelled, 'Oh, she stabbed me.' . . . [A]nd then she stabbed him two more times in the back." J.C. never saw the knife. G.G. testified that at some point during his fight with Justyn he

4

heard Justyn ask about being stabbed, but G.G. did not see anyone walk up to Justyn or stab him. T.P. saw Gonzalez with the knife, but did not witness her stabbing Justyn.

T.P. testified that Gonzalez threatened her while holding the knife and said, "I'll stab you, too," as she advanced. T.P. hit Gonzalez in the torso or face with the tire iron. T.P. dropped or threw the tire iron, told her brother to let G.G. go, and then grabbed Justyn and helped him walk up the driveway to a chair.

The physical altercation ended at this point. T.P. called 9-1-1 while walking her brother up the driveway and exchanging threats with Gonzalez. She told the operator that both "a guy and a girl" stabbed Justyn. Both J.C. and Gonzalez heard T.P. or Justyn yelling that they had "fucked with a skinhead" and they were going to come for her family. G.G. picked up the tire iron and brought it inside. Gonzalez at some point exited the duplex and threw the knife over the fence because she was scared.

C.

Law enforcement arrived at around 12:30 a.m. The first deputy observed "pools of blood" and Justyn seated in a chair, "bleeding profusely." The deputy rendered medical aid, but Justyn was not responsive to his questions, stating only that "it hurt" and he could not breathe.

A detective found the knife used in the stabbing under a barbecue grill by the fence. A forensic evidence technician impounded the knife; the tire iron, found inside the duplex; and Gonzalez's cell phone, found at the scene. A report of the phone's contents revealed that within the same week Gonzalez exchanged text messages in which she claimed to have "almost stuck someone," grabbing him "by the throat" and putting a "blade to his stomach." She sent a similar message to someone else, adding that she was

5

"going to end up in jail." She texted someone else that she had "pulled a knife" on a former friend. She also claimed to be "like a crack head on steroids when I fight." At trial, Gonzalez testified these messages were "lie[s]" or "sarcastic joke[s]."

According to a paramedic who responded to the scene, Justyn was in a confused state and could not tell him what happened. On the way to the hospital, Justyn "bec[a]me pulseless" and did not respond to CPR. He was pronounced dead at the hospital. An autopsy revealed the stab wounds to his torso were the cause of death. A toxicologist testified Justyn had a blood alcohol level of 0.16 percent and metabolites for cocaine and cannabinoids in his blood at the time of his death.

### D.

During a police interview the following day, Gonzalez initially said neither she nor her companions had a knife and that she did not know how Justyn got stabbed. She later admitted, however, that the knife was hers and that she had stabbed Justyn when she panicked. She was arrested and taken into custody.

### E.

The People charged Gonzalez with one count of murder and additionally alleged use of a deadly and dangerous weapon in the commission of the offense.

Trial began in October 2021. The case was submitted to the jury the afternoon of November 17, 2021. The following morning, the jury requested and received a readback of J.C.'s testimony. The morning of November 19, 2021, the jury returned a unanimous verdict of not guilty of first or second degree murder and guilty of voluntary manslaughter, with a true finding as to the weapon allegation.

6

On March 11, 2022, the court sentenced Gonzalez to a term of six years in prison for voluntary manslaughter with a one-year consecutive term for the weapon enhancement.

## II.

## A.

Gonzalez first contends on appeal that the trial court prejudicially erred in excluding some of the evidence she sought to admit to show Justyn's character trait of violence. The People counter that this argument is waived as to some evidence and nonetheless fails on the merits, as the trial court properly exercised its discretion and any error was harmless.

We review a trial court's exclusion of evidence for abuse of discretion. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 827-828.) "Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Wilson* (2021) 11 Cal.5th 259, 304 (*Wilson*).)

For the reasons provided below, we conclude the trial court appropriately exercised its discretion.

## 1.

Generally, "evidence [of specific instances] of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) However, such evidence *is* admissible in a criminal action when "[o]ffered by the defendant to prove conduct of the victim in conformity with the character or trait of character." (Evid. Code,

7

§ 1103, subd. (a)(1).) Thus, "[i]t has long been recognized that where self-defense is raised in a homicide case, evidence of the aggressive and violent character of the victim is admissible." (*People v. Rowland* (1968) 262 Cal.App.2d 790, 797.)

"The admission of such character evidence, however, is not without bounds[.]" (*People v. Wright* (1985) 39 Cal.3d 576, 587.) A trial court may exclude evidence admissible under section 1103, subdivision (a)(1), if the court decides its probative value is "substantially outweighed" by the likelihood it will unduly consume trial time or creates a "substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

### 2.

### a.

Prior to trial, Gonzalez moved in limine to introduce evidence of Justyn's history of violence. The requested evidence pertained to: (1) domestic violence against B.P.; (2) assault against K.P.; (3) assault with a deadly weapon against K.L.; (4) uncharged 2017 property damage involving T.P.'s car; and (5) uncharged 2017 property damage involving his mother's fence and door. On appeal, Gonzalez concedes waiver of two other assaults that we do not address here.

The People, meanwhile, moved to exclude evidence of Justyn's prior violent acts. These instances included: (1) a January 2005 juvenile true finding for a violation of Penal Code section 245, subdivision (a)(1); (2) a September 2005 juvenile true finding for a violation of Penal Code section 211; (3) March 2007 felony convictions for violations of Penal Code sections 211 and 12022, subdivision (b)(1), arising from Justyn taking videogames from a store and pointing a knife at a salesperson; (4) a March

8

2009 felony conviction for violations of Penal Code sections 245, subdivision (a)(1), and 1192.7, subdivision (c)(8), for punching K.P. in the jaw in 2008; (5) a September 2018 detention for a potential violation of Penal Code section 243, subdivision (e)(1), involving B.P., in which Justyn verbally argued with her, broke her phone, and spat on her; (6) an unsolved January 2019 assault case in which one of three unknown suspects had a tattoo similar to one of Justyn's, but the victim did not identify Justyn; and (7) a July 2019 felony conviction for a violation of Penal Code section 245, subdivision (a)(1), for hitting K.L. with a metal bat.

Later, defense counsel also raised an additional domestic violence incident from 2014 involving Gonzalez's friend K.H., in which a restraining order issued after Justyn verbally abused her, threw her phone in the street, and pushed her against a wall multiple times.

The court agreed to allow evidence concerning the July 2019 felony conviction. As for the other incidents, the court was "loath to spend a lot of time" on priors consisting of "detentions, unsolved cases, [and] restraining orders" that are "not attached to any convictions," because "we're going to end up having literally a trial within a trial." The court, however, "ha[d] an open mind."

The defense acknowledged the trial court "has to engage in some sort of line drawing" and thus proceeded to "chisel down to what I really want." As a result, Gonzalez dropped the request for the juvenile incidents. But defense counsel argued to "just talk about the[ ] most recent" offenses was "not [Justyn's] true character." The 2009 and 2019 convictions were defense counsel's "top two" events that "I really want." In addition, defense counsel also thought "the domestic violence incidents are relevant and should be allowed[.]" Those four incidents "at a minimum should come in under 1103."

9

And the defense also wanted to introduce the fact of the 2007 robbery conviction as a "violent felony," without any testimony. But counsel was willing to "give up" everything else.

The court, after "exercis[ing] 352" and "look[ing] at all the factors that are relevant," ruled that evidence of the 2008 and 2019 assaults resulting in convictions would be allowed. However, "in [the court's] balancing act," it tentatively decided not to allow evidence concerning the two domestic violence incidents. It further tentatively declined to allow the defense to introduce a copy of Justyn's 2007 felony conviction. It did not address the juvenile incidents.

During trial, the defense additionally wanted to call G.G.'s girlfriend's mother (Neighbor) to testify about Justyn's character. During her police interview, Neighbor said "she ha[d] seen [Justyn] be violent in the past" and that "he[ was] scary as hell when he'[d] been drinking." The People objected on the ground that further character testimony would be "cumulative and 352 barred," but the defense contended Neighbor's firsthand knowledge made her testimony noncumulative. The court denied Gonzalez's request on the ground that "the convictions speak louder than" the proposed testimony.

During trial, Gonzalez testified that, before the stabbing, she heard about Justyn from her friend K.H. K.H. had been in a relationship with Justyn and "told [Gonzalez] of previous fights that they had that turned physical." After the People objected, the defense argued at sidebar that the evidence of the 2014 domestic violence incident "goes to [Gonzalez's] state of mind." Because "[t]he cat is somewhat out of the bag at this time," the court permitted the defense to "finish this with a question or two," which it did.

Body-worn camera footage of an officer's interview of K.L. following the 2019 incident was played for the jury. K.L.'s statements about Justyn having

10

spent four years in prison and being "'known for breaking into cars'" were not redacted, which made the court "[v]ery unhappy." The People noted that "now they have this in, they have other evidence as it related to what Ms. Gonzalez testified to. And then tomorrow, now they're going to hear from [K.P.] about an incident that happened in 2008. It just seems like one thing after another that keeps slipping in as it relates to [Justyn]'s character."

The court considered "not letting [K.P.] testify," as "[w]e've gone way beyond what this [c]ourt had intended . . . at the beginning as far as character evidence against [Justyn]." However, the court tentatively decided to "let [K.P.] testify, but . . . bare bones, what happened and what injuries happened." The court ultimately permitted the defense 10 minutes of limited testimony from K.P.

b.

The People additionally moved in limine to exclude evidence of white supremacy tattoos on Justyn's body, as any minimal probative value was substantially outweighed by the danger of undue prejudice.

Defense counsel conceded that this issue was "a little squishy" and said, "I don't specifically want in the tattoos." "I certainly don't intend as part of my case in chief to be putting up photos of them." However, defense counsel argued Justyn's threats after the stabbing were "relevant to [Gonzalez's] state of mind." The court tentatively granted the People's motion.

While defense counsel was cross-examining the deputy medical examiner who autopsied Justyn, however, he asked her about a tattoo on Justyn's lower back, prompting a sustained objection from the People. At sidebar, defense counsel argued that "[J.C.] testified that when this altercation was over, there was mention of retribution by so-called

11

skinheads," and since some of Justyn's tattoos "are characterized as skinhead," they "go[ ] to the state of mind of [Gonzalez.]" The People argued Gonzalez's state of mind afterward was irrelevant and this was "just . . . to muddy up" Justyn.

Ultimately, the court permitted "limit[ed]" testimony about two of the tattoos—a pair of "skinhead boots" and the words "Scandinavian pride"—but "exercise[d] 352" to exclude any reference to a swastika tattoo. The deputy medical examiner then testified about the two tattoos.

3.

We discern no abuse of discretion in the court's exclusion of some of the proposed evidence of Justyn's character for violence, even overlooking the People's meritorious waiver argument and considering the entirety of Gonzalez's claim on the merits.

We disagree with Gonzalez's contention that the admitted evidence, "separated by a decade, gave the erroneous appearance that Justyn infrequently resorted to actual violence." The court allowed evidence of the 2008 and 2019 violent felonies that resulted in convictions. It also allowed additional evidence it initially disallowed, including the 2014 domestic violence incident, Justyn's skinhead-affiliated tattoos, Justyn's reputation for vandalism, and Justyn's time in prison. There was sufficient evidence admitted for the jury to reasonably infer that Justyn had a violent character over a span of more than a decade that increased the likelihood that he was the initial aggressor. To reject the remainder of the proffered evidence under Evidence Code section 352 was not an arbitrary decision "result[ing] in a manifest miscarriage of justice." (*Wilson*, *supra*, 11 Cal.5th at p. 304.)

The trial court explicitly stated on the record that it "looked at all the factors that are relevant in deciding the admissibility of these prior acts," and

our deferential review concludes that the court's decision was supported and reasonable. As the People argued, the two juvenile incidents were "incredibly old" and lacked detail. The defense conceded that the victims from the 2007 incident were "long gone" and "having a difficult time even remembering that incident." As the People contended, this incident also was remote from and factually dissimilar to the charged conduct, risking confusion. The 2017 vandalism incidents did not involve physical violence against people and did not result in any arrest, much less conviction, so they would have been unduly distracting and time-consuming. The 2018 domestic violence incident also was factually dissimilar, and presenting that evidence would have required significant trial time given the lack of any conviction. Justyn was not a confirmed suspect in the unsolved 2019 incident, so any limited probative value would be far outweighed by the need for "a trial within a trial" on the matter. Nor did the court abuse its discretion in finding that Neighbor's generic testimony about Justyn's character was less probative than the evidence of Justyn's prior felony convictions. Any probative value was outweighed by the further consumption of trial time on an issue adequately evidenced. On this record, we cannot conclude that excluding this evidence was an abuse of discretion.

As to the swastika tattoo, we agree with the People that it is not "opinion, evidence of reputation, or evidence of specific instances of conduct" and thus does not even fall within the categories of evidence admissible under Evidence Code section 1103, subdivision (a). Defense counsel recognized as much at the motions in limine hearing, stating, "I don't want the tattoos per se because they may represent white supremacy," but rather because the "skinhead" threats were "relevant to [Gonzalez's] state of mind." Besides, we conclude the trial court did not abuse its discretion in finding the

evidence inadmissible under Evidence Code section 352. Given the admitted lack of gang allegations here, the prejudice from such an inflammatory symbol far outweighed any minimal probative value.

We are unconvinced by Gonzalez's claim that this case "shares parallels" with *People v. DelRio* (2020) 54 Cal.App.5th 47 (*DelRio*). In *DelRio*, the prosecution conceded the trial court erred in excluding wholesale evidence of the victim's character for violence because the defendant was unaware of the victim's prior acts, but argued the court reasonably could have excluded the evidence under Evidence Code section 352. (*Id.* at p. 56.) The court of appeal disagreed, noting the issue of the identity of the aggressor was "key" and it would have been an abuse of discretion "simply to exclude everything." (*Id.* at p. 57.) Here, however, the trial court did not "exclude everything." (*Ibid.*) Rather, as *DelRio* recognized is "traditional and proper under section 352," the trial court balanced the "proof of high value" against "other less vital material" and "tailor[ed] the presentation in a discretionary way." (*Ibid.*)

As we find no error in the court's exclusion of portions of the defense's evidence of Justyn's violent character, we need not address the parties' prejudice arguments.

### B.

Second, Gonzalez argues the trial court prejudicially erred by instructing the jury with pattern instructions that included purportedly conflicting statements about whether Gonzalez had to know of Justyn's prior acts of violence for them to be relevant to the jury's determinations as to self- and third-party defense and heat-of-passion voluntary manslaughter. Reviewing de novo Gonzalez's claim of instructional error, we conclude the trial court did not err. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569.)

14

1.

Relevant here, the trial court instructed with: (1) CALCRIM No. 200 (duties of judge and jury), which informed the jurors that "[s]ome of these instructions may not apply, depending on your findings about the facts"; and (2) CALCRIM No. 220 (reasonable doubt), instructing the jury that a defendant is presumed innocent unless and until the People prove otherwise beyond a reasonable doubt.

The trial court also instructed the jury on the general legal principles of homicide using CALCRIM No. 500, which noted Gonzalez was charged with murder and that manslaughter is a lesser offense. The instruction provided a homicide can be lawful "[i]f a person kills with a legally valid excuse or justification," in which case the defendant commits no crime. Otherwise, a killing is unlawful.

The court further instructed the jury with CALCRIM No. 505 (justifiable homicide), both on the theory of self-defense and defense of another. These instructions noted that a defendant is not guilty of murder if: (1) they reasonably believed either they or someone else "was in imminent danger of being killed or suffering great bodily injury"; (2) they reasonably believed that, to defend against that danger, "immediate use of deadly force was necessary"; and (3) they "used no more force than was reasonably necessary to defend against that danger."

As relevant to Gonzalez's claim, these instructions provided that the jury, in assessing reasonableness, should "consider all the circumstances as they were known to and appeared to [Gonzalez] and consider what a reasonable person in a similar situation with similar knowledge would have believed." They further informed the jury that, should it find Justyn "threatened or harmed" either Gonzalez or others "in the past," it "may

15

consider that information in deciding whether [Gonzalez]'s conduct and beliefs were reasonable." Immediately thereafter, the instructions stated: "If you find that the defendant knew that Justyn Preston threatened or harmed others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable." When giving these instructions, the trial court reminded the jury that "[t]he People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must find the defendant not guilty of murder."

The trial court next instructed the jury using CALCRIM No. 520 (first or second degree murder with malice aforethought), which noted a finding of guilty of murder requires a defendant to act with "malice aforethought." CALCRIM No. 521 (first degree murder) immediately followed, which informed the jury that a finding of guilty of first degree murder requires the People to prove beyond a reasonable doubt that the defendant "acted willfully, deliberately, and with premeditation." CALCRIM No. 522 informed the jury that provocation can reduce murder from first to second degree.

The trial court also instructed the jury on several variations of voluntary manslaughter: (1) heat of passion (CALCRIM No. 570), (2) imperfect self-defense (CALCRIM No. 571), and (3) imperfect defense of another (CALCRIM No. 571). The court noted that heat of passion requires provocation, rash action due to intense emotion that obscured the defendant's reasoning or judgment, and a determination that a person of average disposition would have also acted "rashly and without due deliberation." It also informed the jury that the People bore the burden of proving beyond a reasonable doubt that Gonzalez did not kill in the heat of passion.

16

With the two instructions on imperfect defense, the trial court reminded the jury that completely justified self-defense or defense of others requires a finding of "not guilty of any crime," but imperfect defense requires one or both of Gonzalez's beliefs in (1) imminent danger and/or (2) the necessity of immediate use of deadly force to defend against that danger to be unreasonable. The jury was instructed that it should "consider all the circumstances as they were known and appeared to [Gonzalez]" in assessing her beliefs. The imperfect self-defense instruction further provided that if the jury found that Justyn had "threatened or harmed others in the past," it could "consider that information in evaluating the defendant's beliefs," and if it found Gonzalez knew that Justyn "had threatened or harmed others in the past, [it] may consider that information in evaluating [her] beliefs." Both instructions concluded with the admonition that proving beyond a reasonable doubt that the defendant was not acting in imperfect defense was the People's burden, and should they fail to meet that burden, the jury "must find the defendant not guilty of murder."

2.

We agree with the People that the jury instructions Gonzalez challenges correctly stated the law and were not erroneous.

As an initial matter, the People argue Gonzalez forfeited this issue by failing to object to the instructions at trial. However, failure to object below does not forfeit an alleged instructional error affecting a defendant's "substantial rights." (*People v. Christopher* (2006) 137 Cal.App.4th 418, 426; Pen. Code § 1259.) We must, therefore, determine whether the error violated Gonzalez's substantial rights, which "necessarily requires an examination of the merits of the claim." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249; *People v. Rojas* (2015) 237 Cal.App.4th 1298, 1304.)

17

We thus turn to the merits. In assessing whether a jury instruction was erroneous, we first determine "what the relevant law provides," and second "what meaning the charge conveys in this regard." (*People v. Warren* (1988) 45 Cal.3d 471, 487.) We then decide "whether there is a reasonable likelihood that the jury understood the instruction in a manner that violated the defendant's rights," considering the specific language challenged and the instructions as a whole. (*People v. Andrade* (2000) 85 Cal.App.4th 579, 585.)

In a criminal case, the trial court must instruct the jury on relevant general principles of law, even when not requested. (*People v. Garvin* (2003) 110 Cal.App.4th 484, 488 (*Garvin*).) That duty extends to defenses supported by substantial evidence that are not inconsistent with the defendant's case. (*Ibid.*) "Yet this duty is limited." (*Ibid.*) A trial court has no duty to provide a pinpoint instruction "relating particular facts to the elements of the offense charged" not requested by either party. (*People v. Barton* (1995) 12 Cal.4th 186, 197.)

We agree with the People that the trial court correctly instructed the jury with "proper" instructions and reject Gonzalez's claim that the instructions erroneously failed to include express language allowing the jury to use evidence of Justyn's violence to determine the instigator.

Here, the trial court was not obligated to specifically instruct the jury as to how it could use the prior acts evidence. The trial court was required to, and did, instruct the jury on the general principles of justifiable homicide and voluntary manslaughter. These instructions correctly stated the applicable law, and we thus perceive no likelihood that the jury misunderstood the general legal principles of justifiable homicide and voluntary manslaughter.

The issue of whether Justyn was the initial aggressor "highlights a particular aspect of this defense and relates it to a particular piece of

18

evidence," and any instruction on it would be "analogous to a clarifying instruction." (*Garvin*, *supra*, 110 Cal.App.4th at p. 489.) Had Gonzalez requested an instruction on this issue, it may have been error for the court to deny it; but the court was under no obligation to provide additional instruction on its own, and we thus conclude the given instructions were not erroneous.

Further, the instructions were consistent—rather than "contradictory," as Gonzalez contends—as to the jury's ability to consider the prior acts evidence. (*Garvin*, *supra*, 110 Cal.App.4th at p. 489.) While the instructions did not explicitly tell the jury they could consider the evidence of Justyn's former violent acts to infer that he was more likely to have been the aggressor, portions permitted the jury to consider Justyn's past threats and harms to others in deciding the reasonableness of Gonzalez's conduct and beliefs. These instructions do not, as Gonzalez contends, limit consideration of this evidence to its effect on Gonzalez's perceptions, which would necessarily not include prior acts unknown to her. Rather, the language allowed the jury to consider evidence of Justyn's prior conduct to determine whether he acted similarly on this occasion, thus justifying, fully or partially, Gonzalez's actions and beliefs. The instructions about considering Gonzalez's knowledge of Justyn's past threats or harms to others when deciding the reasonableness of her conduct and beliefs did not contradict this permissible use, but rather provided an additional use—the effect of that knowledge on Gonzalez's state of mind—for some, but not all, of the character evidence introduced by the defense.

We reject Gonzalez's argument that the jury would be likely to misunderstand the portions of the charge concerning Gonzalez's knowledge as qualifying or limiting the preceding statements about Justyn's prior

19

violence more generally. Such a reading would render the instruction about past acts about which Gonzalez need not have had knowledge superfluous. We presume jurors are intelligent and able to understand and apply a court's instructions. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 433.) A reasonable jury would have read the two statements in a way that harmonized them rather than eviscerating one. (*People v. Harper* (2020) 44 Cal.App.5th 172, 195 [no reasonable likelihood jury applied allegedly "'nonsensical'" instruction in impermissible manner].) We conclude there was no reasonable likelihood the jurors would have misunderstood that they could consider Justyn's prior acts regardless of Gonzalez's knowledge; thus, the instructions were not erroneous.

As we perceive no error, we need not address any resulting prejudice.

III.

We affirm.

CASTILLO, J.

WE CONCUR:

KELETY, Acting P. J.

RUBIN, J.

20